# CITIZENS' SAVING AND LOAN ASSOCIATION· *v.* PERRY COUNTY.

ERROR TO THE CIRCUIT COURT. OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF ILLINOIS.

No. 56.   Argued and submitted March 29, 1894. — Decided March 4, 1895.

July 3, 1869, the qualified voters of Perry County, Illinois, voted to sub-scribe to the capital stock of the Belleville & Southern Illinois Railroad and to issue its bonds in payment thereof, conditioned that " no bonds should be issued or stock subscribed until the railroad company should locate their machine shops at Duquoin." In December, 1870, the county court directed the bonds to be issued, and they were issued duly executed, and were delivered to the company and by it put into circulation; but the shops· were never located at Duquoin. *Held,* In view of the leg-islation of Illinois reviewed in the opinion, and of the provisions in the constitution of 1870, which came into force after the vote to issue the bonds, but before their issue, that the county court by its order to issue the bonds, and the county officers by issuing them, violated their duty as prescribed by the statutes; and as the bonds contained no recital pre cluding inquiry as to the performance of the condition upon which the people voted in favor of their issue, it was open to the county to show

that it had not been performed, which being shown, the bonds became subject to the provisions of the constitution of 1870, and were invalid. The bonds issued by the same county to the Chester & Tamaroa Coal & Railroad Company were issued in obedience to a vote of the people taken at an election ordered and held with reference to the act of April 16, 1869, referred to in the opinion of this court, which act required that a majority of the legal voters living in the county should be in favor of the subscription; and as the county court, in ordering the issue of the bonds, certified on its record that all the conditions prescribed had been complied with, and as the fact that a majority of the voters living in the county at the time of the election did not vote for the issue of the bonds is not determinable by any public record, *Held*, that it would be rank injustice to permit it to be set up after the lapse of so many years, and that the issue was valid and the bonds are binding in the county.

THE case is stated in the opinion.

*Mr. George A. Sanders* for plaintiff in error. *Mr. William B. Sanders* filed a brief for same.

*Mr. Thomas J. Layman*, for defendant in error, submitted on his brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action was brought to recover the amount of certain coupons taken from bonds issued in the name of Perry County, Illinois, and made payable, some of them, to the Belleville and Southern Illinois Railroad Company or bearer; others, to the Chester and Tamaroa Coal and Railroad Company or bearer.

The bonds, in each instance, were issued in payment of a subscription in the name of that county to the capital stock of the corporations to which they were respectively made payable.

The parties, by written stipulation, waived a jury and the case was tried by the court.

It was found by the court that an election was held in the county of Perry on the 3d day of July, 1869, upon the

question of subscription to the capital stock of the Belleville and Southern Illinois Railroad Company, to be paid by the bonds of that county; that the notices for the election contained a clause providing, among other things, that "no bonds should be issued or stock subscribed *until the railroad company should locate their machine shops at Duquoin*," and that the shops, costing about $150,000, were located at East St. Louis and not at Duquoin.

In respect of the bonds issued to the Chester and Tamaroa Railroad Company it was found that the proposition for a subscription by the county to the capital stock of that corporation, upon which the people voted February 19, 1870, "*did not receive a majority of the qualified voters of the county*, 986 votes only being cast in favor of it, while at the last preceding general election held in November, 1869, there were 2024 votes thrown;" in other words, that the proposition failed, by 27 votes, to receive a majority of the qualified voters of the county.

The conclusion of law as to each class of bonds was that, by reason of the facts so found, they were void for want of power to issue them.

*First. The bonds issued to the Belleville and Southern Railroad Company.*

The Belleville and Southern Illinois Railroad Company was incorporated by an act of the general assembly of Illinois, approved February 14, 1857, with authority to locate, construct, and operate a railroad from the city of Belleville in St. Clair County southwardly by way of the village of Pinckneyville to some eligible point on the Illinois Central Railroad in Perry County. By the ninth section of its charter the directors of the company were "authorized and empowered to take and receive subscriptions to their said capital stock on such terms and in such amounts as they may deem for the interest of said company, and as they may prescribe by their by-laws and regulations, from any other railroad company or corporation, and from any county, city, town, or village; and any such subscriptions shall be valid and binding upon any railroad company, corporation, county,

city, town, or village making the same : *Provided*, Said subscriptions shall be made. in every respect subject to the provisions and restrictions of an act supplemental to an act entitled 'An act to provide for a general system of railroad incorporations,' approved November 6 1849." It was provided that the road should be completed within eight years from the passage of the act.

The act of 1849, here referred to, gave cities and counties authority to purchase or subscribe for shares of the capital stock of any railroad company then organized or incorporated, or which might be thereafter organized or incorporated, in any sum not exceeding one hundred thousand dollars for each city or county — the stock so subscribed for or purchased to be under the control of the county court of the county or the common council of the city making the subscription or purchase· in all respects as stock owned by individuals. § 1. Authority was given to pay for such stock by borrowing money or issuing bonds. § 2. Railroad companies then or thereafter organized or incorporated, under the laws of the State, were authorized to receive at par the bonds of any county or city becoming subscribers to their capital stock. 1 Gross' Ill. Stat. 1869, p. 552.

By that act it was further provided :

"§ 4. No subscription shall be made, or purchase or bond issued by any county or city under the provisions of this act, whereby any debt shall be created by said judges of the county court of any county, or by the common council of any city, to pay any such subscription, unless a majority of the qualified voters of such county or city (taking as a standard the number of votes thrown at the last general election previous to the vote had upon the question of subscription under this act for county officers) shall vote for the same; . . . and if a majority of the voters of said county or city, assuming the standard aforesaid, shall be in favor of the same, such authorized subscription or purchase, or any part thereof, shall be then made by said judges or common council. In case any election had under this act is held upon a day of general election, then the number of votes thrown at such general

election for county officers shall be the standard of the number of qualified voters as aforesaid. . . ." 1 Gross' Ill. Stat. 1869, pp. 552, 553.

These bonds were dated January 1, 1871, and made payable twenty years after date to the railroad company or bearer, with interest at seven per cent per annum. Each bond, signed by the county judge and the county clerk, and attested by the county seal, contained the following recitals: " This bond is one of a series of one hundred of like tenor and date, issued under the authority, and in accordance with the requirements of an act of the legislature of the State of Illinois, entitled 'An act to incorporate the Belleville and Southern Illinois Railroad,' approved February 14, 1857, and is redeemable at the pleasure of said county at any time after the first day of January, A.D. 1876." Each coupon, signed by the same officers, was in this form: " The county of Perry, State of Illinois, will pay to the bearer seventy dollars on the first Monday of January, 1889, being the interest on bond No.    issued to the Belleville and Southern Illinois Railroad Company."

On the day the bonds were directed by the county court to be issued, namely, December 5, 1870, the following communication and certificate under the county seal, and verified by the oath of the county judge, was sent to the Auditor of Public Accounts of Illinois:

" SIR: I herewith transmit to you for registration in your office under the provisions of the act entitled 'An act to fund and provide for paying the railroad debts of counties, townships, cities, and towns, in force April 16, 1869,' the following bonds, being one hundred in number, dated January 1, 1871, amounting to ($100,000) one hundred thousand dollars, payable on the first day of January, 1891, and bearing interest at the rate of seven per centum per annum — payable annually. These bonds are issued by the county court of the county of Perry and State of Illinois to the Belleville and Southern Illinois Railroad Company, under and by authority of the provisions of an act entitled ' An act to incorporate the Belleville and Southern Illinois Railroad,' approved February 14, 1857 ; and I, as judge of the county court of said county, do hereby

certify that all the preliminary conditions in the act in force April 16, 1869, required to be done to authorize the registration of these bonds and entitle them to the benefits of the said act last referred to have been fully complied with, to the best of my knowledge and belief."

Upon each bond was endorsed a certificate by the Auditor of Public Accounts of the State of Illinois, under his seal of office, " that the within bond has been registered in this office this day, pursuant to the provisions of an act entitled ' An act to fund and provide for paying the railroad debts of counties, townships, cities, and towns,' in force April 16, 1869."

Although these bonds did not upon their face expressly refer to the railroad act of 1849, the recital in them that they were issued under the authority of and in accordance with the act of 1857 incorporating the railroad company imports a compliance with the provisions of the former act; for the act of 1857 declares that the subscriptions authorized by it should be made in every respect subject to the provisions and restrictions of the act of 1849. If, therefore, the case depended alone on the acts of 1857 and 1849, in connection with the recitals in the bonds, the conclusion would be that the county of Perry rightfully subscribed to the stock of the Belleville and Southern Illinois Railroad Company to the extent of one hundred thousand dollars (for which amount the subscription was made and the bonds issued), and that the county was estopped, by the representations made in the recitals of the bonds, as between it and *bona fide* holders thereof, from relying upon any irregularities in the exercise of its power to subscribe that did not involve the substance of the power itself.

But we are not at liberty to look alone to the acts of 1857 and 1849, and the recitals in the bonds. Although the election relating to the subscription of the stock was held July 3, 1869, the county court did not make its order for the issue of bonds until after the section of the constitution of Illinois of 1870, forbidding municipal subscriptions to the stock of railroad corporations, went into operation, which, as held in *Schall* v. *Bowman*, 62 Illinois, 321, *Louisville* v. *Savings*

*Bank,* 104 U. S. 469, and *Concord* v. *Robinson,* 121 U. S. 165, 169, was on the second day of July 1870. That provision was in these words : " No county, city, township, or other municipality shall ever become subscriber to the capital stock of any railroad or private corporation, or make donation to or loan its credit in aid of such corporation : *Provided, however,* That the adoption of this article shall not be construed as affecting the right of any such municipality to make such subscriptions *where the same have been authorized, under existing laws* by a vote of the people of such municipalities prior to such adoption." 1 Charter and Constitutions, 491. Touching this constitutional provision, we have heretofore held that, since July 2, 1870, " no municipal corporation of Illinois has possessed authority to subscribe to the stock of a railroad or private corporation, or to make donations to or loan its credit to them, except that a subscription or donation, lawfully voted by the people before the adoption of that section, could be completed upon the terms and conditions approved by the electors. There is no saving of the right of such corporations to loan their credit to railroad corporations, where such loan of credit was not embraced in a vote previously taken under existing laws, and which was favorable to a subscription of stock or a donation." " The constitution took away all power to impose upon the township any greater burdens than the people had by vote lawfully assumed under existing statutes." " They [purchasers of the township bonds] were bound to know that the power of the township, after July 2, 1870, was restricted by the constitution to a completion of such subscription or donation as had been lawfully voted before that date ; if not upon the precise terms and conditions attached thereto by the vote of the people, upon such terms as did not increase the burden." *Concord* v. *Robinson,* 121 U. S. 165, 169.

At the time — May 26, 1869 — the county court ordered an election to ascertain the popular will as to the proposed subscription to be paid by bonds of the county; the act of April 16, 1869, entitled " An act to fund and provide for paying the railroad debts of counties, townships, cities, and

towns," was in full force.  That act was referred to in the endorsement made on each bond by the Auditor of State, as well as in the official communication of the county judge of Perry County transmitting them for registration.  It applied to every county, township, incorporated city or town that had created a debt in aid of the construction of railways that were to be completed within ten years after its passage, as well as those which should create a debt of the character named under any law of the State.  It contained the following, among other provisions:

"§ 7. And it shall not be lawful to register any bonds under the provisions of this act, or to receive any of the benefits or advantages to be derived from this act, until after the railroad in aid of the construction of which the debt was incurred shall have been completed near to or in such county, township, city, or town, and cars shall have run thereon; and none of the benefits, advantages, or provisions of this act shall apply to any debt unless the subscription or donation creating such debt was first submitted to an election of the legal voters of said county, township, city, or town, under the provisions of the laws of this State, and a majority of the legal voters living in said county, township, city, or town were in favor of such aid, subscription, or donation; and any county, township, city, or town shall have the *right*, upon making any subscription or donation to any railroad company, to prescribe the conditions upon which bonds, subscriptions, or donations shall be made, and such bonds, subscriptions, or donations *shall not be valid and binding until such conditions precedent shall have been complied with*.  And the presiding judge of the county court, or the supervisor of the township, or chief executive officer of the city or town, that shall have issued bonds to any railway or railways, immediately upon the completion of the same near to, into, or through such county, township, city, or town as may have been agreed upon, and the cars running thereon, shall certify under oath that all the preliminary conditions in this act required to be done, to authorize the registration of such bonds and to entitle them to the benefits of this act, have been complied

with, and shall transmit the same to the state auditor, with a statement of the date, amount, number, maturity, and rate of interest of such bonds, and to what company and under what law issued; and thereupon the said bonds shall be subject to registration by the state auditor, as hereinbefore provided." Pub. Laws Ill. 1869, pp. 317, 319.

Now it is found as a fact that the people voted for the subscription on the condition, specified in the election notices, that no subscription should be made nor bonds issued until the company's machine shops were located at Duquoin. The act of 1869 not only authorized the electors to prescribe such a condition, but declared that no bonds, subscriptions, or donations, that were voted on prescribed conditions, shall have been " valid and binding until such conditions precedent should have been complied with." That the location of the company's machine shops at Duquoin was a condition precedent to the making of a subscription or the issuing of bonds in payment thereof is placed beyond question not only by the special finding of facts but by the orders of the county court which were made part of the record for the purpose of presenting the exceptions taken to those orders as evidence in the case.

The order of the county court, made May 24, 1869, submitting to popular vote, at an election to be held July 3, 1869, the question of subscription, provided :

" And be it further ordered, that no bonds be issued or stock be subscribed by said court to the Belleville and Southern Illinois Railroad Company, unless twelve hundred and thirty legal voters of said county shall have voted in favor of the same at said election ; nor until said company shall have built said road, and put the same in operation from Belleville to Duquoin, through the town of Pinckneyville, with depot and depot buildings at said town, nor unless said road shall be in operation from Belleville to Duquoin on or before the first day of January, A.D. 1871, *and shall locate their machine shops at said Duquoin.* And be it further ordered that said bonds shall be in the sums of not less than one hundred nor more than one thousand dollars, payable at any time within twenty years from their date, at the option of the said county

court, bearing interest at the rate of 7 per cent per annum, and issued under the provisions of the act of the legislature of Illinois of November 6, 1849, *and act of April* 16, A.D. 1869, entitled 'An act to fund and provide 'for the paying of the railroad debts of counties, townships, cities, and towns.' "

Looking then at the act of April 16, 1869, and the constitution of Illinois, there is no escape from the conclusion that the condition precedent, imposed by popular vote, that no bonds should be issued until or unless the company located its machine shops at Duquoin, was in full force when the election was ordered and held, as well as when the constitutional limitation upon municipal subscriptions was prescribed; and that both the county court by its order of December 5, 1870, directing the issue and delivery of the bonds, and the county officers, who executed them, violated their duty as prescribed by the statute.

But it is urged that the bonds having been executed and issued by those whose duty it was to execute and issue them whenever that could be rightfully done, the county is estopped to plead their invalidity as between it and a *bona fide* purchaser for value. This argument would have force, if the material circumstances bringing the bonds within the authority given by law were recited in them. In such a case, according to the settled doctrines of this court, the county would be estopped to deny the truth of the recital as against *bona fide* holders for value. But this court, in *Buchanan* v. *Litchfield*, 102 U. S. 278, 292, upon full consideration, held that the *mere* fact that the bonds *were* issued, without any recital of the circumstances bringing them within the power granted, was not in itself conclusive proof in favor of a *bona fide* holder, that the circumstances existed which authorized them to be issued.

In the bonds here in question there are no recitals precluding inquiry as to the performance of the conditions upon which the people, after the passage of the act of April 16, 1869, voted in favor of a subscription to be paid by bonds of the county. Those recitals only imply that the bonds were issued under the authority and in accordance with the acts of

1857 and 1849. Those who took them must be held to have known that the constitution of 1870 withdrew from municipal corporations authority to subscribe to the stock of, or to lend their credit to, railroad corporations, except for the purpose of *completing* subscriptions authorized under previous laws by a vote of the people. And they must also be held to have known that by the act of 1869 no subscription voted on conditions precedent could be rightfully made nor bonds rightfully issued until such conditions were performed. If, notwithstanding the express declaration in the act of 1869 as to the invalidity of bonds issued without the performance of conditions precedent imposed by popular vote, the county court prior to the constitution of 1870, without the sanction of a popular vote, could have waived the condition as to the location of the machine shops at Duquoin, there is no evidence on its records or otherwise that it did so. And it is clear that they could not, after the 2d of July, 1870, materially change the conditions imposed by the electors. It is equally clear that the recitals by the county officers in the bonds themselves do not import any such change nor a compliance with the provisions of the act of 1869 in respect to the performance of the conditions voted.

The plaintiff in error is mistaken when it insists that its position, as to the conclusive effect of the recitals in the bonds, is sustained by the decision in *Insurance Co.* v. *Bruce*, 105 U. S. 328. The bonds there in suit recited that they were issued by virtue of the charter, approved April 15, 1869, of the particular company to which they were delivered, *as well as by virtue of the act of April* 16, 1869. The court held that the latter act did not make it obligatory to impose conditions upon the issuing of bonds, but only gave the *right* to prescribe conditions ; that the recitals fairly imported that nothing remained to be done in order to make the bonds binding obligations upon the town in the hands of *bona fide* purchasers. " Under these circumstances," the court said, " the town, by every principle of justice, is estopped, as against a *bona fide* holder, to plead conditions, the existence of which were withheld from the public either to facilitate the negotia-

tion of the bonds in the markets of the country, or because it had full confidence that the railroad company would meet the prescribed conditions. It should not now be heard to make a defence inconsistent with the recitals upon its bonds, or upon the ground that the conditions imposed, of which the purchasers had no notice, have not been performed."

The fact that the bonds in suit in *Insurance Co.* v. *Bruce* recited that they were issued in virtue of the act of April 16, 1869 — implying thereby that they were issued conformably, in all respects, to the provisions of that act — was alluded to by this court in *German Bank* v. *Franklin County*, 128 U. S. 526, 540, 542, where one of the questions was whether a county in Illinois, issuing bonds which, upon their face, made no reference whatever to the act of April 16, 1869, was estopped to show that they were issued in disregard of certain conditions precedent imposed by popular vote. The court, referring to the grounds of the decision in *Insurance Co.* v. *Bruce*, said : "The view taken was that, as the town of Bruce had power, under the seventh section of the act of April 16, 1869, to make an unconditional subscription, and to issue and deliver its bonds in advance of the construction of the road, and *as the bonds recited that they were issued by virtue of the act of April* 16, 1869, it was too late to claim that they had been issued in violation of the special conditions. In the case now before us, as before said, there is no reference, in the bonds, to the act of April 16, 1869, and no statement in the bonds that they were issued by virtue of that act." And what was said in *German Bank* v. *Franklin County* in relation to the registration of the bonds is applicable to the present case : "The registration of the bonds by the state auditor has nothing to do with any of the terms or conditions on which the stock was voted or subscribed. Neither the registration nor the certificate of registry covers or certifies any fact as to compliance with the conditions prescribed in the vote on which alone the bonds were to be issued. The recital in the bonds does not contain any reference to the act of April 16, 1869, or certify any compliance with the provisions of that act ; and the certificate of registry

merely certifies that the bond has been registered in the
auditor's office pursuant to the provisions of the act of April
16, 1869. The statute does not require that the auditor
shall determine or certify that the bonds have been regularly
or legally issued." In *Cairo* v. *Zane*, 149 U. S. 122, 141, 142,
this court, while holding, upon the authority of *German Bank*
v. *Franklin County*, that the certificate of registry was not
conclusive that the bonds were issued in full compliance with
the terms and conditions of a subscription of stock, adjudged
that the certificate of registry in the office of the state auditor
could be relied upon as showing that what the city of Cairo
did, in that case, amounted to a subscription of stock, which
the statute gave it a right to make, rather than to a donation,
which it could not legally make. It is to be observed, also,
that the bonds there in suit recited that they were issued pur-
suant as well to an ordinance of the city council of Cairo as to
a vote of the citizens of that city, and in accordance with the
laws of the State. The recital that they were issued in
accordance with the laws of the State brought that case
within the rule announced in *Insurance Co.* v. *Bruce*, rather
than within that announced in *German Bank* v. *Franklin
County*.

We cannot assume that the location of the company's ma-
chine shops at Duquoin was deemed by the voters to be a
matter of no consequence. It may well be that the election
turned upon the question of the location of those shops in the
county at a named place.

It results from what has been said, that, as the recitals in
the bonds issued to the Belleville and Southern Illinois Rail-
road Company neither expressly nor by necessary implication
imported a compliance with the condition precedent imposed
by popular vote in reference to the location of the company's
shops at Duquoin, it was open to the county to show that that
condition was not performed when the bonds were issued by
order of the county court, and had never been performed.
That being shown, the case is not brought within the reserva-
tion or saving made by the state constitution in favor of sub-
scriptions authorized by popular vote prior to July 2, 1870.

In this view the judgment, holding the bonds issued to the Belleville and Southern Illinois Railroad Company to be invalid, was right..

*Second. The bonds issued to the Chester and Tamaroa Coal and Railroad Company.*

The Chester and Tamaroa Coal and Railroad Company was incorporated by an act approved March 4, 1869, with authority to construct, complete, and operate a railroad from Chester in Randolph County, Illinois, easterly on the most eligible route by the way of Pinckneyville to Tamaroa in Perry County.

The history of the bonds issued to this company is fully disclosed in the orders of the county court of Perry County.

On the 18th day of January, 1870, that body, at a special term on that day begun, ordered an election to be held at the usual places of voting in the several precincts of the county of Perry, on the 19th day of February, A.D. 1870, by the judges of election appointed at the September term, 1869, of the court, to ascertain if the county court would subscribe one hundred thousand dollars to the capital stock of the Chester and Tamaroa Coal and Railroad Company. The order provided that no stock be subscribed " unless nine hundred and eighty-four (984) legal voters of said county shall have voted for the same at said election; " " that the subscription should be paid in county bonds in sums of not less than one hundred dollars nor more than one thousand dollars each, payable at any time within twenty years from date, at the option of the county court, bearing interest at the rate of seven per cent per annum," " said bonds to be registered and paid as provided in an act entitled an 'Act to fund and provide for paying railroad debts of counties, townships, cities, and towns,' in force April 16, 1869 ; but no bonds shall be registered or paid except in the following manner and upon the following conditions, to wit : $50,000 of said bonds shall be issued to said railroad and coal company, when they shall have completed said road and cars for passengers and freight, shall have run thereon to Pinckneyville, in said Perry County, and depot and depot buildings shall have been established or built within the corporate limits of said town of Pinckneyville, provided the work on

said road shall commence at Tamaroa and depot and depot buildings shall have been established or built within the corporate limits of said town of Tamaroa; and be it further ordered that the residue, $50,000, shall be issued when said road shall be completed through the county, and thence to the terminus of said road, and cars shall have been run thereon, and all necessary depot and depot buildings have been established or built as above required and specified. The ballots in favor of subscribing the stock shall contain the words 'for subscription' and those against the subscription, 'against subscription.' "

At the regular term of the county court, held March 8, 1870, an order was made which referred to the previous one for an election, and proceeded : "And whereas, in pursuance of said order and published notices thereof, as required by law, said election was held in said county on the 19th day of February, A.D. 1870; and whereas it appears from the returns of said election on file in the county clerk's office of said county, and the certificate of the board of canvassers that a *majority of the legal voters of said county of Perry* (assuming the standard *required by law and the said order of the court, taking as a basis the number of votes cast at the last general election for county officers*) having voted in favor of subscribing said stock: Now, therefore, it is ordered by the court, in pursuance of said order of court and the election held thereunder, and the statutes in such case made and provided, that the county of Perry, in the State of Illinois, do subscribe one hundred thousand dollars to the capital stock of the Chester and Tamaroa Coal and Railroad Company, to be paid in bonds issued in accordance with said order of court under which said election was held, and to be registered and paid as provided by an act of the general assembly of the State of Illinois, in force February 16, 1869, entitled ' An act to fund and provide for paying the railroad debts of counties, townships, cities, and towns;' and it is further ordered by said court that the judges of this court subscribe said stock on the books of said company, and that the same be attested by the clerk of this court under the seal of this court."

On the 8th of June, 1870, the county court, in regular term, made an order showing the delivery to it on that day of a

certificate of stock issued by the Chester and Tamaroa Coal and Railroad Company, which certificate was ordered to be recorded and filed; that the county had subscribed and was entitled to the benefits of one thousand shares of $100 each, of the capital stock of the company, "to be paid in Perry County bonds, as provided by the terms of subscription made by the county court on the books of the company and the election held on the 19th day of February, 1870, authorizing said court to make said subscription, and transferable on conditions as provided in the by-laws."

At a special term of the county court, held November 10, 1871, the county court made an order reciting all previous orders, and stating that the company had completed their railroad from Tamaroa to Pinckneyville, had run cars for freight and passengers thereon, had built depot buildings in Tamaroa and Pinckneyville, and had complied with and fulfilled *all the conditions of the order of the court made at its January special term, 1870, to entitle it to have and receive from the county of Perry the first issue of said bonds.* That order concluded as follows :

" Now, therefore, be it ordered by the court that Charles E. R. Winthrop, judge of the county court, and J. Carroll Harriss, clerk of said court, sign and deliver to said company or their authorized agent or attorney fifty bonds of said county for the sum of one thousand dollars each; that the said bonds be of date of the first day of July, 1871, and draw interest from their date, payable semi-annually, at the American Exchange National Bank, in the city of New York, and that all coupons on said bonds maturing on and previous to the said first day of July, 1871, be cut off by the said Charles E. R. Winthrop, judge, and J. Carroll Harriss, clerk of said court, before delivering the same to said company, and that the said judge of the county court be authorized to certify *under oath that all the conditions of the order made on the 18th day of January, 1870, above recited, have been complied with by the said Chester and Tamaroa Coal and Railroad Company,* and that said bonds be registered and paid in pursuance of an act of the general assembly of the State of Illinois

entitled 'An act to fund and provide for paying the railroad debts of counties, townships, cities, and towns.' "

On the 15th of November, 1871, a certificate similar in form to the one issued December 5, 1870, in reference to the bonds to the Belleville and Southern Railroad Company, and verified by the oath of the county judge and under the county seal, was sent by that officer to the Auditor of Public Accounts of Illinois. And on the 6th day of December, 1871, a like certificate was made by the county judge in respect to fifty other bonds issued by the county to the Chester and Tamaroa Coal and Railroad Company.

The bonds issued to the last-named company were similar, in their general form, to those issued to the Belleville and Southern Illinois Railroad Company, each one being signed by the county judge and the county clerk, under the county seal, and containing the following recitals : "This bond is one of a series of bonds, issued by the county of Perry, in payment of one hundred thousand dollars of the capital stock of the Chester and Tamaroa Coal and Railroad Company, in pursuance of an election held by the legal voters of Perry County, Illinois, on the 19th day of February, 1870, and by virtue of the provisions of an act of the general assembly of the State of Illinois, entitled 'An act to provide for a general system of railroad incorporation,' approved November 6, 1849. And for the payment of said sum of money, and accruing interest thereon, and in the manner aforesaid, the faith of the county of Perry, State of Illinois, is hereby irrevocably pledged, as also its property, revenue, and resources." Each coupon signed by the county judge and county clerk was in this form : "The county of Perry will pay to bearer on the 1st day of July, 1888, at the American Exchange Bank, in the city of New York, thirty-five dollars, it being six months' interest on bond No. 52 for $1000."

Upon each bond was endorsed a certificate by the auditor of public accounts to the effect "that the within bond has been registered in this office this day pursuant to the provisions of an act entitled 'An act to fund and provide for paying the railroad debts of counties, townships, cities, and towns, in force April 16, 1869."

We have seen that the only ground upon which the court below held these bonds to be not binding obligations of the county was that the proposition to subscribe $100,000 to the capital stock of the company received only 986 votes in its favor; whereas at the last general election in the county 2024 votes were cast. The court, we infer, had in mind the provision of the act of November 6, 1849, under the authority of which the bonds purport upon their face to have been issued.

If we looked alone to the act of 1849 as authority for issuing these bonds, there would be ground for holding that the provision of the constitution of 1870 relating to municipal subscriptions and bonds would be an insuperable obstacle in the way of any recovery on the coupons of bonds issued to this company. For the act of 1849 in express words forbade the making of subscriptions or the issuing of bonds except upon a vote of a majority of qualified voters, taking as a standard the vote cast at the next preceding general election for county officers. What number of votes would meet that requirement could be determined by reference to the official record of the election. All who took bonds issued under the act of 1849 were bound to take notice of what that record disclosed. The constitution intended that that record, being accessible to all, should speak for itself. The number of votes at the last preceding general election was not dependent upon any calculation or investigation or weighing of facts by officers charged with the duty of issuing bonds under that act. If, therefore, the case depended upon the act of 1849, the judgment of the court below would be sustained on the authority of *Northern Bank* v. *Porter Township*, 110 U. S. 608, 616, in which it was said : "The adjudged cases, examined in the light of their special circumstances, show that the facts which a municipal corporation issuing bonds in aid of the construction of a railroad, was not permitted, against a *bona fide* holder, to question, in face of a recital in the bonds of their existence, were those connected with or growing out of the discharge of the ordinary duties of such of its officers as were invested with authority to execute them, and which the statute conferring the power made it their duty to ascertain and determine before the bonds were

issued, not merely for themselves, as the ground of their own action, in issuing the bonds, but, equally, as authentic and final evidence of their existence, for the information and action of all others dealing with them in reference to it." In the same case it was said that, although, the power existing, a municipality may be estopped by recitals to prove irregularities in its exercise, and when the law prescribes conditions upon the exercise of the power granted and commits to the officers of such municipalities the determination of the question whether those conditions have been performed, the corporation will also be estopped by recitals importing such performance, nevertheless, "the question of legislative authority in a corporation to issue bonds in aid of a railroad company cannot be concluded by mere recitals."

But we are of opinion that the court below erred in holding, as in effect it did, that there could be no valid subscription to the stock of the Chester and Tamaroa Railroad Company except upon a vote of the majority of the qualified voters of the county, taking as the standard the number of votes cast at the last preceding general election for county officers. The plea of the county did not proceed distinctly on that ground. It only alleged that the bonds issued to this company were not authorized "by a majority vote of the electors of said county *as required by law.*" The orders of the county court, under which the election of February 19, 1870, was held, show that the election was ordered and held *with reference to the act of April* 16, 1869, and that the purpose of the county was to take the benefits and advantages of that act — one of the provisions of which, as we have seen, was that its benefits, advantages, or provisions shall not apply to any debt created, unless the subscription or donation, by which it was created, was first submitted to the qualified voters of the municipality under the provisions of the laws of the State, and "a majority of the legal voters *living in said county,* township, city, or town were in favor of such aid, subscription, or donation." The order of the county court for the election provided that no subscription of stock should be made "unless nine hundred and eighty-four legal voters of

said county shall have voted for the same at said election."
Two more than that number of votes were cast in favor of the
subscription, and only ninety-one against it. There is no find-
ing to the effect that nine hundred and eighty-four votes was
*not* a majority of legal voters *living in the county* at the time
of the election.

We have seen that the county court, at its ·special term in
November, 1871, not only certified, upon its record, that *all*
the conditions prescribed by its order at the January term,
1870, had been complied with by the railroad company, but
authorized the county judge to make a similar certificate
under oath. It even certified, upon its records, that the sub-
scription had been voted for by a majority of the qualified
voters, *taking as the standard the vote cast at the preceding
general election for county officers.* The number of such voters
who, at the time of election, *lived in the county* was a fact
dehors any official record of votes, and was to be ascertained
by the county court or county judge upon examination. It
did not depend wholly upon an official record, speaking as of
the date of the election. Under any reasonable interpretation
of the act, the county court was invested with authority to
determine whether the majority of voters living in the county
voted in favor of the subscription proposed. If the purchaser
had examined the orders of the county court, he would have
ascertained that those orders several times expressly stated
that all the conditions prescribed by the county and upon
which the people voted had been fully complied with. It
would be rank injustice to permit the county, after the lapse
of so many years, to say that a majority of the voters *living
in the county* at the time of election — a matter not determi-
nable by any public record — did not vote for the subscription.
What may be the fact upon this point it is, perhaps, impossible
now to determine. Indeed, as we have said, the court below
did not find that those who voted for the subscription were
not a majority of all the voters living in the county at the
time of the election. It only found that the subscription
failed, by twenty-seven votes, to secure in its favor a majority
of the qualified voters, taking as a standard the votes cast at

the next preceding general election for county officers. But, as has already been shown, that was not the true test.

This construction of the act of 1869 is in harmony with the decision of the Supreme Court of Illinois in *Town of Prairie &c.* v. *Lloyd*, 97 Illinois, 179, 197, 198, one of the questions in which case was whether certain municipal bonds were entitled to be registered under the act of 1869. Mr. Justice Mulkey, speaking for the court, said: "Before railroad aid bonds can be properly registered under the above act, it must appear that they were issued in pursuance of a vote of a majority of the voters living in the municipality issuing them. When once registered, the presumption is they were rightfully registered, and the burden of establishing the contrary rests upon the party affirming it. It is well settled by the decisions of this court where a majority of those voting at an election of the kind vote in favor of subscription or donation, as the case may be, for the purposes of registration it will be presumed that such majority so voting is a majority of all the legal voters living in the municipality at the time of the election; and where, in such case, the authorities, acting upon such presumption, have admitted the bonds to registration, and the municipality issuing them has, as in this case, treated them as properly registered by paying previous taxes levied by the auditor for the liquidation of accruing interest, and the bonds thus registered have passed into the hands of innocent holders, nothing but the clearest and most satisfactory proof will authorize a court of equity to enjoin the collection of a tax levied by the auditor on account of such bonds, on the alleged ground that the majority voting for such subscription or donation was not a majority of the legal voters." In the case now before us it appears that the county paid interest on the bonds in suit for about seventeen years, and there is no proof whatever that the votes cast for subscription, payable in bonds, did not represent a majority of all qualified voters living at the time in the county.

The case is within numerous decisions of this court sustaining the validity of bonds issued by municipal corporations. *Town of Coloma* v. *Eaves*, 92 U. S. 484; *Buchanan* v. *Litch-*

*field,* 102 U. S. 278; *Dixon County* v. *Field,* 111 U. S. 83, 92, 93; *Cairo* v. *Zane,* 149 U. S. 122.

We are of opinion that the court below erred in holding that the bonds issued to the Chester and Tamaroa Railroad Company were not binding upon the county of Perry, and in not giving judgment against the county for the amount of the coupons of such bonds in suit.

*The judgment is reversed, and the cause remanded for a judgment, upon the facts found, in conformity with this opinion.*