2002 UT 57

**GRAND COUNTY, Plaintiff, Appellee, and Cross–Appellant,**

v.

**EMERY COUNTY and the City of Green River, Defendants, Appellants, and Cross–Appellees.**

No. 20010044.

Supreme Court of Utah.

June 25, 2002.

⚠︎2

W. Scott Barrett, Logan, for Grand County.

David A. Blackwell, Castle Dale, for Emery County, Gerald H. Kinghorn, David J. Burns, Salt Lake City, for Green River.

RUSSON, Justice:

¶ 1 Emery County and the City of Green River ("Green River") appeal the trial court's declaratory judgment in favor of Grand County declaring that section 17–2–6(2) of the Utah Code is unconstitutional under article XI, section 3 of the Utah Constitution, and appeal the trial court's failure to certify the election results approving Emery County's annexation of that portion of Green River located within Grand County ("Green River portion of Grand County") pursuant to their petition for election review. Grand County cross-appeals the trial court's grant of Emery County and Green River's petition for election review and the trial court's attendant interpretation of section 17–2–8 of the Utah Code.

## BACKGROUND

¶ 2 This appeal arises out of a long-standing controversy between neighboring Grand County and Emery County and Green River, which straddles those counties' common border. The Green River portion of Grand County, with the consent and encouragement of Emery County, petitioned the relevant county legislative bodies to be annexed by Emery County, the desired result being that all of Green River would be located in Emery County instead of spread across two counties. These same parties were before this court in 1998 in connection with the same underlying controversy. In that case, *Grand County v. Emery County*, 969 P.2d 421 (Utah 1998), Grand County successfully challenged a previous version of section 17–2–6, the statute at issue in this appeal, in an attempt to thwart Emery County's annexation of the Green River portion of Grand County. While the underlying controversy between the counties remains the same, the statutory framework within which the battle rages has been changed by the Utah Legislature through the subsequent enactment of House Bill 49 ("H.B.49"), H.B. 49, 53d Leg., Gen. Sess., 2000 Utah Laws 115, during the 2000 general session. The constitutionality of the amended statutory scheme is the central subject of this appeal.

## PROCEDURAL HISTORY

¶ 3 On August 3, 2000, Grand County filed an action seeking declaratory and injunctive relief against Emery County and Green River related to Emery County's attempt to annex the Green River portion of Grand County. On September 1, 2000, Grand County moved for a preliminary injunction in an effort to prevent Emery County and Green River's annexation proposal from being submitted to the voters of Emery County and the voters of the Green River portion of Grand County. The trial court denied Grand County's motion for injunctive relief but directed any party wishing to challenge the results of the election to petition for election review at the appropriate time after the election. The annexation proposal was submit-

ted to the relevant voters in the 2000 general election.

¶ 4 After the election, Grand County refused to certify the election with regard to the annexation proposal. Emery County and Green River petitioned for election review on December 1, 2000, to compel certification of the voters' approval of the annexation proposal. The trial court consolidated Grand County's original action for declaratory judgment with the petition for election review.

¶ 5 On December 14, 2000, the trial court granted Emery County and Green River's petition for election review and determined that the relevant annexation statute, sections 17–2–6 and –8 of the Utah Code, requires approval of an annexation proposal by a majority of the voters in the area of the city or town to be annexed and the annexing county, and that in the 2000 general election, a majority of the voters in Emery County and the Green River portion of Grand County had approved the proposal. Despite this determination, the trial court refused to certify the election results because it simultaneously held section 17–2–6(2) of the Utah Code, the statute pursuant to which the election was held, unconstitutional, and consequently, granted Grand County its requested declaratory relief. The trial court ruled that section 17–2–6(2) of the Utah Code was unconstitutional because it violated the "general law" provision of article XI, section 3 of the Utah Constitution. The parties timely appealed.

### STANDARD OF REVIEW

¶ 6 The issue of "[w]hether a statute is constitutional is a question of law, which we review for correctness, giving no deference to the trial court." *State v. Daniels*, 2002 UT 2, ¶ 30, 40 P.3d 611; *see also State v. Kell*, 2002 UT 19, ¶ 50, —— P.3d ——; *Grand County v. Emery County*, 969 P.2d 421, 422 (Utah 1998). Furthermore, to the extent we are making a determination of a statute's constitutionality, the " 'statute is presumed constitutional, and we resolve any reasonable doubts in favor of constitutionality.' " *Utah Sch. Bds. Ass'n v. State Bd. of Educ.*, 2001 UT 2, ¶ 9, 17 P.3d 1125 (quotation and citation omitted); *see also Daniels*, 2002 UT 2 at ¶ 30, 40 P.3d 611. Additionally,

because interpreting the Utah Constitution presents a question of law, we review the trial court's determination for correctness and give no deference to its legal conclusions. *State v. Casey*, 2002 UT 29, ¶ 19, 44 P.3d 756; *Cache County v. Prop. Div. of State Tax Comm'n*, 922 P.2d 758, 766 (Utah 1996).

### ANALYSIS

### I. CONSTITUTIONALITY OF THE ANNEXATION STATUTE

¶ 7 On appeal, Emery County and Green River first argue that the trial court erred in granting Grand County declaratory judgment that section 17–2–6(2) is unconstitutional. In ruling that section 17–2–6(2) is unconstitutional, the trial court concluded that section 17–2–6(2)'s requirement—that a county wishing to annex a portion of the territory from an adjoining county must first acquire a concurrent resolution passed by a two-thirds majority of both houses of the legislature approving the annexation proposal and then the governor's signature approval on such a resolution—violated the "general law" provision of article XI, section 3 of the Utah Constitution, which establishes the general procedure and voting requirement regarding county annexations and the legislature's power to delineate the conditions of the annexation process. *See* Utah Const. art. XI, § 3.

¶ 8 Emery County and Green River maintain that section 17–2–6(2), H.B. 49, which amended section 17–2–6, and House Concurrent Resolution 6, H. Con. Res. 6, 53d Leg., Gen. Sess., 2000 Utah Laws 1660–61—the resolution passed by the legislature approving the annexation proposal—either are not "special laws," or in the case of the concurrent resolution, is not a "law" at all, and therefore, they do not violate article XI, section 3.

¶ 9 Article XI, section 3 of the Utah Constitution provides:

No territory shall be stricken from any county unless a majority of the voters living in such territory, as well as of the county to which it is to be annexed, shall vote therefor, and then only under such

conditions as may be prescribed by general law.

Utah Const. art. XI, § 3.

¶ 10 This provision sets forth the basic requirements and framework for annexation and delegates to the legislature the authority to dictate the conditions under which annexation may occur. However, the legislature's power to set those conditions is limited by the provision in that the legislature may prescribe such conditions only "by general law." *Id.*

¶ 11 Pursuant to this constitutional provision, the legislature enacted title 17, chapter 2 of the Utah Code. Specifically, section 17-2-6 prescribes the conditions under which one county can annex a portion of the territory of an adjoining county. This section of the statute sets forth two different annexation methods.

¶ 12 The first annexation method (the "traditional method") allows for a majority of the voters in an area of a county to petition their county legislative body to allow the area in which they live to be annexed by an adjoining county. Utah Code Ann. § 17-2-6(1)(a). The county legislative body, upon receiving such a petition in accordance with the provisions of the statute, must submit the annexation proposal to the voters of the county from which territory is to be annexed and to the voters of the county to which the territory is to be annexed. *Id.* § 17-2-6(1)(b). Under this annexation method, an annexation proposal is approved if "a majority of those voting in each county have voted in favor of [the] annexation." *Id.* § 17-2-8(2)(a) (Supp. 2001).

¶ 13 The second or alternative annexation method (the "amended alternative method"), which is at issue in this case, was amended by the passage of H.B. 49 during the 2000 general session of the legislature. The amended alternative method provides for a similar petition process but goes further and sets forth a modified and supplemental procedure applicable where the area seeking to be annexed shares a common boundary with the annexing county and where the area proposed to be annexed (1) "is located within a city or town whose boundaries extend into the proposed annexing county," (2) "is contig-

uous to the portion of the city or town that is located within the proposed annexing county," and (3) "includes all of the city or town that is within the county from which the area is proposed to be taken." Utah Code Ann. § 17-2-6(2)(a)(i)(A)-(C). Under these circumstances, one county can annex a portion of an adjoining county if "by a two-thirds vote of each house, the Legislature passes a concurrent resolution" approving the annexation proposal, *id.* § 17-2-6(2)(a)(ii), the governor signs the concurrent resolution, *id.* § 17-2-6(2)(a)(iii), and an economic analysis of the annexation proposal is conducted and the analysis demonstrates that the cost and revenue effects of the annexation proposal fall within the specific parameters described in the statute, *id.* § 17-2-6(2)(b). In an election on an annexation proposal brought under the amended alternative method, an annexation proposal is approved if "a majority of voters living in the area proposed for annexation" and "a majority of voters living in the county to which the area is proposed to be annexed have voted in favor of annexation." *Id.* § 17-2-8(2)(b).

¶ 14 In order to determine if section 17-2-6, as amended by H.B. 49, is constitutional under article XI, section 3, we must determine if it is a general law. The standards for evaluating challenged legislation under the "general law" provisions of the Utah Constitution are set forth in *Utah Farm Bureau Insurance Co. v. Utah Insurance Guaranty Ass'n:*

A general law applies to and operates uniformly upon all members of any class of persons, places, or things requiring legislation particular to themselves in the matters covered by the laws in question. On the other hand, special legislation relates either to particular persons, places, or things or to persons, places, or things which, though not particularized, are separated by any method of selection from the whole class to which the law might, but for such legislation, be applied.... The constitutional prohibition of special legislation does not preclude legislative classification, but only requires the classification to be reasonable.

564 P.2d 751, 754 (Utah 1977); *see also* 73 Am.Jur.2d *Statutes* § 5 (1974). Furthermore, where the legislature has made such a legislative classification, the classification

> is never unreasonable or arbitrary in its inclusion or exclusion features so long as there is some basis for the differentiation between classes or subject matters included as compared to those excluded from its operation, provided the differentiation bears a reasonable relation to the purposes to be accomplished by the act....
>
> ....
>
> ... If a reasonable basis to differentiate those included from those excluded from its operation can be found, it must be held constitutional.

*Utah Farm Bureau Ins. Co.*, 564 P.2d at 755–56 (quotations omitted). In other words, a law is a general law where, to the extent it makes a classification, that classification (1) is reasonable and (2) applies and operates uniformly as to all members composing the class.

¶ 15 Section 17–2–6, as amended by H.B. 49, is a general law. It is clear that the amended alternative method provided for in section 17–2–6(2) creates a legislative classification and differentiates between portions of counties generally and those portions that are cities or towns that straddle county boundaries. Neither of the parties disputes the reasonableness of this classification.

■ ¶ 16 While the plain language of H.B. 49 does not provide an express indication of the legislature's basis for differentiating between portions of counties generally that seek annexation and those areas of counties that are portions of cities or towns that straddle county lines that seek annexation, and there does not appear to be any legislative history associated with H.B. 49 to guide us, it is not difficult to discern from the language of the bill and the statute that the legislature was concerned about keeping cities and towns wholly within a single county instead of two counties. The cities and towns belonging to the class occupy the

unique position of straddling a county boundary and falling within two counties.[1] The purpose of the legislation is to provide an additional, and in some respects easier, method of annexation for the cities and towns caught in the awkward position of straddling a county line. The legislature did not arbitrarily include or exclude members from the class to which the statute is applicable, but instead, included only members to which the purpose of the statute might apply. Therefore, the legislature's basis for differentiating between the members of the class subject to section 17–2–6(2) and other portions of counties in general "bears a reasonable relation to the purposes to be accomplished by the act" and is otherwise reasonable. *Utah Farm Bureau Ins. Co.*, 564 P.2d at 756.

■ ¶ 17 As to the "uniform operation" requirement for general laws, Grand County essentially argues that section 17–2–6(2) was enacted specifically to address the Green River situation and that the statute will not operate uniformly as to the other members of the class because the statute includes no legal standards related to the passage of a concurrent resolution by the legislature or approval of such a resolution by the governor. Grand County argues that under the statutory scheme as it now stands, there is no guarantee that any of the other class members will be able to successfully lobby the legislature and the governor for passage and approval of a concurrent resolution similar to the one secured by Emery County and Green River in this case. Grand County's arguments are unavailing.

¶ 18 Section 17–2–6(2) applies uniformly to the members of the class. As previously indicated, there are four cities/towns that are presently members of the class. One of those class members, Green River, has successfully employed the procedure provided for in the statute. Any of the other class members may utilize the section 17–2–6(2) procedures in the same manner as Green River did. Under the uniform operation of the statute, those class members would be

---

1. There are presently four cities/towns that fall into the class created by the statute. While the number of members of the class may be relatively small, this does not render the law in question "special." 73 Am.Jur.2d *Statutes* § 10 (1974). Moreover, as populations grow and shift, and as cities and communities expand, new members of the class may come into existence.

required to lobby the legislature for a concurrent resolution, to secure the governor's signature of such a resolution, to conduct the required economic analysis, and ultimately to gain the approval of a majority of the voters living in the appropriate areas. The procedure for the class members is identical. Green River was afforded no special treatment in the application of the law, and there is no indication that any other class member would be treated any differently or required to meet any disparate burdens. The mere fact that Emery County and Green River were successful in utilizing the amended alternative method does not render the statute a special law.

¶ 19 Grand County further argues that even if the underlying annexation statute is a general law, the concurrent resolution passed by the legislature and signed by the governor is a special law, or has the effect of a special law, since such a resolution is required by the underlying statute and no vote on annexation can go forward without the resolution. The trial court appeared to endorse essentially the same argument when it concluded in its memorandum decision that the "concurrent resolution approved by the Governor is functionally indistinguishable from legislation." We disagree.

¶ 20 The concurrent resolution is not a "law" and therefore is not subject to the "general law" limiting language of article XI, section 3 because a resolution of the Utah Legislature is not legislation and does not have the force or effect of law. *Salt Lake City v. State Tax Comm'n*, 813 P.2d 1174, 1177 (Utah 1991); 73 Am.Jur.2d *Statutes* § 3 (1974) ("[T]he general rule is that a joint or concurrent resolution adopted by the legislature is not a statute, [and] does not have the force or effect of law . . . .").

¶ 21 Nor does the requirement of a concurrent resolution passed by the legislature and signed by the governor transform the underlying general law into a special one. The concurrent resolution required as part of the amended alternative method has no effect of law. It neither grants nor denies annexation to a city or town or county. It merely represents a condition precedent to an annexation proposal brought under the amend-

ed alternative method being presented to the relevant voters in the county or area to be annexed. Article XI, section 3 of the Utah Constitution clearly indicates that such conditions may be set by the legislature.

¶ 22 Finally, in its memorandum decision the trial court characterized the requirement of a concurrent resolution as giving the "last word on any county boundary change" to the legislature and the governor instead of to the voters. This is incorrect.

¶ 23 We read the plain language of the statute "as a whole," interpreting its provisions "in harmony with other provisions in the same statute and 'with other statutes under the same and related chapters.'" *Lyon v. Burton*, 2000 UT 19, ¶ 17, 5 P.3d 616 (quoting *Roberts v. Erickson*, 851 P.2d 643, 644 (Utah 1993) (per curiam)). The trial court's analysis and conclusion ignore the presence of the traditional method in section 17–2–6(1). The concurrent resolution requirement does not give the legislature and the governor the "last word" on county boundary changes because a city or town that is unsuccessful in utilizing the procedures of the amended alternative method in section 17–2–6(2) by not acquiring a concurrent resolution from the legislature, or for that matter, an economic analysis that meets the requirements of the amended alternative method, would always have recourse to the traditional method found in section 17–2–6(1), which is free from all of the additional requirements of the amended alternative method.

¶ 24 Therefore, the trial court erred when it concluded as a matter of law that section 17–2–6, as amended by H.B. 49, was an unconstitutional "special law" because the legislative classification made by the statute has a reasonable basis that is reasonably related to the purposes of the statute and because the statute applies and operates uniformly as to the members of the class.

## II. INTERPRETATION OF "VOTERS"

¶ 25 On cross-appeal, Grand County challenges the trial court's conclusion that section 17–2–8 of the Utah Code requires that an

annexation proposal brought pursuant to section 17–2–6(2) receive a majority of the votes of those who actually voted on the annexation proposal in the area to be annexed and in the annexing county in order to be approved. Emery County and Green River appeal the trial court's refusal to certify the result of the election in accordance with the trial court's interpretation of the statute and its determination that the annexation proposal received the required electoral approval.

¶ 26 Grand County argues that the statute should be interpreted to require that an annexation proposal brought under section 17–2–6(2) receive a majority of the votes of "registered" voters in the area to be annexed and in the annexing county in order to be approved. Grand County supports its position by noting that the legislature amended the language of section 17–2–8(2)(b) that sets forth the standard for approval of an annexation proposal brought pursuant to section 17–2–6(2). Prior to the legislature's amendment of section 17–2–8(2)(b) through the enactment of H.B. 49, the standard of approval for an annexation proposal brought pursuant to either subsection 17–2–6(1) or subsection 17–2–6(2) was the same "majority of those voting" standard. The amendment altered the language setting forth the approval standard for section 17–2–6(2) annexation proposals from a majority of "those voting" in the area proposed for annexation and in the county to which the area is to be annexed, Utah Code Ann. § 17–2–8(2)(b) (1999), to a majority of "voters living" in those two areas, Utah Code Ann. § 17–2–8(2)(b) (Supp.2001). Grand County argues that the legislature amended the language of the statute to require approval of a majority of "voters living" in the relevant areas in order to impose a higher standard than the majority of "those voting" requirement. In Grand County's view, the new language inserted by the legislature requires a majority of "registered" voters in the relevant areas even if those registered voters failed or chose not to vote on the annexation proposal in question. Under Grand County's statutory interpretation of section 17–2–8, the amended language of section 17–2–8(2)(b) cannot be interpreted to set the same standard of approval for an annexation proposal as the "majority of those

voting" language in section 17–2–8(2)(a) which was left unaffected by H.B. 49's amendment. If the two phrases are interpreted as meaning the same thing, section 17–2–8(2)(a) becomes redundant with section 17–2–8(2)(b) and the change in the language was unnecessary. In other words, according to Grand County, the legislature's decision to change the language was purposeful and the change would not have been made unless some different meaning and standard was in fact intended.

■ ¶ 27 The voting requirement associated with county annexation is constitutionally mandated and defined. *See* Utah Const. art. XI, § 3. The legislature has the authority to set the conditions of annexation by general law, but it does not have the authority to establish or modify the voting requirement set forth in the plain language of article XI, section 3. Because the voting requirement is constitutionally intended and described, and because the language of the statute and the constitution are identical, we interpret the constitutional language and impute that meaning to the same language used by the legislature in the statute. *See Odd Fellows' Bldg. Ass'n v. Naylor*, 53 Utah 111, 114, 177 P. 214, 215 (1918); *see also People ex rel. Baird v. Tilton*, 37 Cal. 614, 622 (1869) ("The same construction should be given to the same language used in the same connection, in reference to a similar subject matter, when used in a statute, as when used in the Constitution."); *People ex rel. Akin v. The Butler St. Foundry & Iron Co.*, 201 Ill. 236, 66 N.E. 349, 355 (1903) ("[W]hen [a] statute is couched in the same language as the Constitution, the language of the statute will receive the same construction as that of the Constitution . . . ."). In the case at hand, the legislature's use of the exact language of the constitution suggests that it intended the language of section 17–2–8(2)(b) and section 17–2–6(2)(a)(iv)(A)(B) to have the same meaning and effect as the language of the constitution. *See State v. Woodcock*, 168 Vt. 588, 719 A.2d 32, 32 (1998). As a result, we need not address Grand County's arguments based on the interpretation of the statute or the legislature's intent in amending the language of the statute but rather focus our analysis on

the meaning and interpretation of the constitutional provision.

¶ 28 As previously recited, article XI, section 3 prohibits the territory of one county from being annexed by another county "unless a majority of the voters living in such territory, as well as of the county to which it is to be annexed, shall vote therefor." Utah Const. art. XI, § 3.

¶ 29 "In interpreting the state constitution, we look primarily to the language of the constitution itself ...." *State v. Gardner*, 947 P.2d 630, 633 (Utah 1997). Therefore, our starting point in interpreting a constitutional provision is the textual language itself. *See State v. Casey*, 2002 UT 29, ¶ 20, 44 P.3d 756; *Utah Sch. Bds. Ass'n v. State Bd. of Educ.*, 2001 UT 2, ¶ 13, 17 P.3d 1125; *In re Inquiry Concerning a Judge (Young)*, 1999 UT 6, ¶ 62, 976 P.2d 581 (Stewart, J., dissenting). "We need not inquire beyond the plain meaning of the [constitutional provision] unless we find it ambiguous." *Casey*, 2002 UT 29 at ¶ 20, 44 P.3d 756.

¶ 30 The language at issue here is clear and unambiguous. "Voter" is defined as a "person who engages in the act of voting." *Black's Law Dictionary* 1571 (7th ed.1999). Under this definition, article XI, section 3 requires a majority of persons who engage in the act of voting who live in the territory to be annexed, as well as those who live in the county to which that territory is to be annexed, to vote in favor of an annexation proposal in order for it to be approved. In other words, the group of voters of which a majority is required consists merely of those who exercise the right to vote on the annexation proposal in question at the election in which the annexation proposal is offered for a vote. The number of votes cast at the ballot box itself is the basis for determining a majority, as opposed to the number of those possessing the qualifications to vote or those registered to vote in the annexing county or area to be annexed but who do not actually vote. Those citizens who fail or choose not to vote are presumed to assent to and acquiesce in the expressed will of the majority. This interpretation of the meaning and effect of the phrase "majority of voters" is consistent with the well-settled, general rule of American election law concerning the method of computing a majority and with the long-standing interpretations of similar constitutional language by the highest courts of our kindred states.[2]

2.  *Citizens' Sav. & Loan Ass'n v. Perry County*, 156 U.S. 692, 712, 15 S.Ct. 547, 39 L.Ed. 585 (1895) ("It is well settled by the decisions of this court where a majority of those voting at an election ... vote in favor of [a proposition] for the purpose of registration [or certification] it will be presumed that such majority so voting is a majority of all the legal voters living in the municipality at the time of the election ...."); *County of Cass v. Johnston*, 95 U.S. 360, 369, 24 L.Ed. 416 (1877) ("All qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares."); *Glover v. Hot Springs Kennel Club, Inc.*, 230 Ark. 544, 323 S.W.2d 902, 905 n. 4, 907 (1959) (interpreting constitutional and statutory language of " 'majority of the voters of the county' " and " 'majority of the qualified electors of such county' " as meaning "a majority of those voting on the proposition" (citations omitted)); *Vance v. Austell*, 45 Ark. 400, 406–07 (1885) (endorsing and applying reasoning of *County of Cass v. Johnston*, 95 U.S. 360, 24 L.Ed. 416); *People ex rel. Mitchell v. Warfield*, 20 Ill. 159, 164–65 (1858) (interpreting Illinois constitution's language requiring majority of voters of county to approve relocation of county seat as meaning majority of "voters of the county ... who ... vote at the election" and as excluding "other voters of the county who were detained from the election by absence or sickness, or [who] voluntarily absented themselves from the polls"); *In re Todd*, 208 Ind. 168, 193 N.E. 865, 872–77 (1935) (interpreting "voter" and "elector" in Indiana constitution and holding that group of voters of which majority is required consists of those who exercise right to vote); *Walker v. Oswald*, 68 Md. 146, 11 A. 711, 713 (1887) ("It has been settled, both in England and in this country, by an almost, if not quite, unbroken current of judicial decisions from the time of Lord Mansfield to the present day, that when an election is held at which a subject-matter is to be determined by a majority of the voters entitled to cast ballots thereat, those absenting themselves, and those who, being present, abstain from voting, are considered as acquiescing in the result declared by a majority of those actually voting, even though, in point of fact, but a minority of those entitled to vote really do vote."); *Taylor v. Taylor*, 10 Minn. 107, 116–17 (1865) (interpreting Minnesota constitutional provision requiring that laws changing established county lines be approved by majority of electors of county to be affected and rejecting as manifestly inconvenient and absurd position that

¶ 31 Grand County's interpretation of the constitutional language would essentially read the word "registered" into article XI, section 3 of the constitution, and consequently, require that the number of those voting in favor of the annexation proposal be a majority of those registered to vote in the annexing county and the area to be annexed instead of a majority of those voters from the relevant areas who actually voted on the annexation proposition during the election. This would effectively allow those registered voters in the two areas who did not actually vote to be counted as votes against the annexation proposal. Such a method of computing whether a majority of voters have approved a proposition or have elected a candidate would be contrary to the plain meaning of the constitutional provision and the long-established general rule.[3]

¶ 32 Therefore, the trial court correctly concluded that only a majority of those voting on the annexation proposal in Emery County and the Green River portion of Grand County needed to vote in favor of the annexation proposal for it to be approved. However, the trial court erred in not certifying the results of the election in accordance with this standard and its determination that the required electoral approval had been achieved.

## CONCLUSION

¶ 33 For the foregoing reasons, the trial court erred in declaring that section 17–2–6(2) of the Utah Code is unconstitutional because it violates the "general law" provision of article XI, section 3 of the Utah Constitution. Therefore, the trial court's grant of declaratory judgment to Grand County is reversed. Furthermore, the trial court also erred when it refused to certify the annexation proposal election results consistent with its finding that the annexation proposal had received the approval of the required majority of voters in Emery County and the Green River portion of Grand County. The case is remanded for further proceedings consistent with this opinion and the trial court's previous finding that the annexation proposal received the required electoral approval.

¶ 34 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice HOWE, and Justice WILKINS concur in Justice RUSSON'S opinion.

provision requires absolute majority of those qualified to vote in county at time of election); *Louisville & Nashville R.R. Co. v. County Ct.*, 33 Tenn. 637, 691–93 (1854) (holding that when approval of proposition is referred "to the decision of a majority of the 'voters of a county,' [that phrase] cannot be understood [to] mean anything more than those who see fit to exercise the privilege [of voting on the proposition]"); 26 Am.Jur.2d *Elections* § 406 (1996) ("In the absence of a statutory provision to the contrary, voters not attending the election or not voting on the matter submitted are presumed to assent to the expressed will of those attending and voting and are not to be taken into consideration in determining the result."); George W. McCrary, *A Treatise on the American Law of Elections in McCrary on Elections* § 208 (4th ed. 1897) ("Where a statute [or constitutional provision] requires a question to be decided ... by the votes of 'a majority of the voters of a county,' this does not require that a majority of all persons in the county entitled to vote shall actually vote affirmatively, but only that the result shall be decided by the majority of the votes cast .... The 'voters of the county' referred to by all such statutes [or constitutional provisions] are necessarily the voters who vote at the election, since the result in each case must be determined by a count of the ballots cast and not by an inquiry as to the number not cast.").

3. It is worth noting that the general rule as stated herein for computing a majority of voters in an election can be modified by legislative enactment to require a greater majority. The legislature may require a two-thirds majority of voters or a majority of "registered" voters; however, it may do so only where granted the authority by the constitution and then only through explicit and clear language. As previously discussed, article XI, section 3 does not give the legislature authority to modify the voting requirement or approval standard set forth in the constitutional provision. In any event, it appears that the legislature was not attempting to modify or increase the majority required for approval of a section 17–2–6(2) annexation proposal, but rather, merely attempting to implement the stated voting requirement and standard as it appears in article XI, section 3 by using the constitution's exact language.