2006 UT 51

**UNIVERSITY OF UTAH, a body corporate and politic under Utah law, and Michael K. Young, President of the University of Utah, Plaintiffs and Appellees,**

v.

**Mark L. SHURTLEFF, Utah Attorney General, Defendant and Appellant.**

No. 20030877.

Supreme Court of Utah.

Sept. 8, 2006.

Alan L. Sullivan, Todd M. Shaughnessy, Amy F. Sorenson, Salt Lake City, for plaintiffs.

Mark L. Shurtleff, Att'y Gen., Brent A. Burnett, Asst. Att'y Gen., Salt Lake City, for defendant.

M. Gay Taylor, Robert H. Rees, Chris Parker, Salt Lake City, for amicus State Legislature.

PARRISH, Justice:

¶ 1 For many years, the University of Utah has enforced a policy prohibiting its students, faculty, and staff from possessing firearms on campus. During its 2004 General Session, the Utah Legislature passed Utah Code section 63–98–102, a statute prohibiting state and local entities from enacting or enforcing any ordinance, regulation, rule, or policy that in "any way inhibits or restricts the possession or use of firearms on either public or private property." The conflict between the University's policy and section 63–98–102 requires that we assess the relative authority of the University and the legislature to regulate firearms on the University's campus.

¶ 2 Relying on article X, section 4 of the Utah Constitution, the University maintains that it is an autonomous constitutional entity with the authority to disregard Utah law that interferes with its internal academic affairs and that section 63–98–102 constitutes such a law. In contrast, the Attorney General maintains that the University has no power or autonomy under the constitution that would permit it to disregard state law. We agree with the Attorney General. Indeed, the University's claim is unsupported by the text of our state's constitution, its historical context, or the prior decisions of this court.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 3 The University is a public university established by Utah's constitution and statutes. Over 44,000 students, faculty, and staff comprise the University community. The main campus includes not only the requisite classrooms and offices but also an assortment of facilities ranging from an extensive health sciences complex to a preschool. In addition, it includes facilities frequented by guests of the University, such as a 46,000–seat football stadium, a 15,000–seat indoor arena, and cultural and entertainment centers.

¶ 4 Utah's Enabling Act requires the University to "forever remain under the exclusive control of" the State of Utah. Act of July 16, 1894, ch. 138, 28 Stat. 107, 110. To that end, the Utah Legislature created the Utah State Board of Regents, which has authority to "enact regulations governing the conduct of university and college students, faculty, and employees." Utah Code Ann. § 53B–3–103(1) (Supp.2004). The board of regents has, in turn, enacted regulations giving the University's president the responsibility to

maintain a safe and orderly campus, as well as the authority to issue policies aimed at ensuring the safety and security of people and property on the University's campus. The legislature also has authorized the University's president to exercise authority delegated by the board of regents, as well as other "necessary and proper ... powers" not denied the University "by the [board of regents] or by law," to run the University efficiently and effectively. *Id.* § 53B–2–106(1) (2000). The University enforces its regulations pursuant to those grants of power. *Id.* § 76–8–708(1) (2003).

¶ 5 One of the regulations enacted by the University is a firearms policy. The policy, which prohibits students, faculty, and staff from carrying guns on campus and "while conducting University business off campus," authorizes disciplinary action for violations. Numerous University administrative bodies endorse the policy, and those responsible for campus safety view it as a success.

¶ 6 The University's firearms policy became the subject of heated debate in 2001, when Utah Attorney General Mark Shurtleff issued Opinion No. 01–002, in which he opined that a Utah Department of Human Resource Management rule forbidding state employees to carry guns in state facilities violated Utah's Uniform Firearms Act. In footnote thirteen of that opinion, the Attorney General expressed his agreement with the Office of Legislative Research and General Counsel's Formal Opinion 98–01, which had concluded that the University's firearms policy was contrary to the Uniform Firearms Act. After issuing Opinion No. 01–002, the Attorney General reiterated on numerous occasions his view regarding the illegality of the University's firearms policy.

¶ 7 In response, the University sued the Attorney General in the United States District Court for the District of Utah ("federal court"), seeking a declaration that Utah law does not prevent it from enforcing its firearms policy and that any interference with the policy would violate its right to academic freedom as guaranteed by the First and Fourteenth Amendments to the United States Constitution. The Attorney General moved for judgment on the pleadings. The University, in turn, moved for summary judgment.

¶ 8 Because the Eleventh Amendment to the United States Constitution immunizes the Attorney General from suits under state law in federal court, the federal court found that it lacked jurisdiction to decide the University's state law claims and dismissed them without prejudice. It also invoked the federal *Pullman* abstention doctrine, declining to consider the University's federal constitutional claims until a court with proper jurisdiction decided the University's state law claims. *See R.R. Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The federal court directed the University to seek adjudication of its state law claims in state court and, pursuant to *Pullman,* retained jurisdiction over the federal claims.

¶ 9 The University then sued the Attorney General in Utah state court, seeking a declaration that its firearms policy was contrary to neither the Uniform Firearms Act, *id.* §§ 76–10–500 to –530 (2003), nor the Concealed Weapon Act, Utah Code Ann. §§ 53–5–701 to –711 (2002). In the alternative, the University sought a declaration that article X, section 4 of the Utah Constitution guaranteed it institutional autonomy over firearms regulation, thereby allowing it to continue to enforce its firearms policy in spite of any contrary Utah law. The Attorney General moved to dismiss the University's suit, and the University countered with a motion for summary judgment.

¶ 10 The district court denied the Attorney General's motion to dismiss and granted the University's motion for summary judgment, holding that the University's firearms policy was not contrary to Utah law. The court reasoned that the Uniform Firearms Act merely "established uniform criminal penalties for" those who violated Utah's firearms laws and that the Concealed Weapon Act merely "addressed the validity of a concealed weapons permit, the circumstances under which one must be issued, and the circumstances under which a valid permit holder may nevertheless be subject to criminal prosecution for possession of a concealed weapon." It concluded that the University's fire-

arms policy was not inconsistent with either of these statutes because the policy applied only to students, faculty, and staff who voluntarily chose to associate themselves with the University.[1] The district court's conclusion that the University's firearms policy was consistent with Utah statutory law obviated the need for it to address the University's claimed right to institutional autonomy under article X, section 4 of the Utah Constitution.

¶ 11 The Attorney General appealed. Shortly after he filed his initial brief, the legislature passed Senate Bill 48, later codified at sections 63–98–101 to –102 of the Utah Code. *See id.* §§ 63–98–101 to –102 (2004). Section 63–98–102 provides, "Unless specifically authorized by the Legislature by statute, a local authority or state entity may not enact, establish, or enforce any ordinance, regulation, rule, or policy pertaining to firearms that in any way inhibits or restricts the possession or use of firearms on either public or private property." *Id.* § 63–98–102(5). The statutory definition of the phrase "[l]ocal authority or state entity" includes "state institutions of higher education," such as the University. *Id.* § 63–98–102(6)(b). The passage of section 63–98–102 dramatically altered the legal landscape, rendering it clear that Utah's firearms statutes are universally applicable, rather than merely criminal in nature as the district court had concluded, and that the University's firearms policy does, in fact, violate Utah law.

¶ 12 Because the enactment of section 63–98–102 conclusively resolved the statutory interpretation issue in a manner contrary to the holding of the district court, both the University and the Attorney General suggested that the district court's decision on that point had been rendered moot, obviating the need for this court to review that issue. The parties further suggested that the University's constitutional claim, which the district court had not reached, was ripe for

adjudication and should be addressed by this court. We agreed and directed the parties to proceed with briefing on the constitutional issue.

¶ 13 The University contends that section 63–98–102 is unconstitutional as applied to the University because the University enjoys institutional autonomy under article X, section 4 of the Utah Constitution. Consistent with that theory, the parties restricted their briefing in this court to the scope of the University's autonomy under article X, section 4 of the Utah Constitution.

¶ 14 During oral argument, we inquired as to whether article I, section 6 of the Utah Constitution was relevant to the University's claim of institutional autonomy under article X, section 4. Article I, section 6 provides, "The individual right of the people to keep and bear arms for security and defense of self, family, others, property, or the state, as well as for other lawful purposes shall not be infringed; but nothing herein shall prevent the legislature from defining the lawful use of arms." Following oral argument, we ordered the parties to submit supplemental briefs on the following question: "Assuming for purposes of argument that Article X, Section 4 of the Utah Constitution guarantees the University of Utah some degree of institutional autonomy, does Article I, Section 6 remove gun regulation from the scope of that autonomy?" We also invited the Utah Legislature to weigh in as amicus curiae, an invitation it accepted.

¶ 15 Before turning to the merits of the University's constitutional claim, we pause to discuss the applicable standard of review. This case is before us on appeal from the district court's entry of summary judgment in favor of the University. However, the enactment of section 63–98–102 subsequent to the district court's decision mooted the statutory basis for the summary judgment, requiring that we address the constitu-

---

1. The Attorney General also argued that several other statutory provisions invalidated the University's firearms policy. First, he relied on Utah Code section 78–27–64, which reserves to the legislature the power to regulate firearms. Utah Code Ann. § 78–27–64 (2002). Second, he argued that Utah Code section 53B–3–103 prohibits the University from "restrict[ing] the lawful possession or carrying of firearms." Utah Code

Ann. § 53B–3–103(2)(a)(ii) (Supp.2004). Finally, he argued that because Senate Bill 170, passed during the 2002 legislative session, declined to reauthorize the University's firearms policy, the policy was invalid. *See* Reauthorization of Administrative Rules, ch. 325, 2002 Utah Laws 1572, 1572. The district court rejected all of these claims as well.

tional issue that the district court did not reach. The fact that we are being asked to "review" an issue not addressed below renders this case somewhat unique, but does not require us to depart from the standard of review applicable to cases decided on summary judgment. When material facts are not in dispute, we focus solely on the legal basis for the district court's ruling, which we review de novo. Similarly, we review de novo a district court's interpretation of constitutional provisions, granting it no deference. *Provo City v. Ivie*, 2004 UT 30, ¶ 7, 94 P.3d 206. It is accordingly immaterial that the district court did not reach the constitutional issue presented here because we would apply a de novo standard of review in any event.

## ANALYSIS

¶ 16 We begin by addressing the additional question we asked the parties to brief, namely, whether article I, section 6 of the Utah Constitution informs our interpretation of article X, section 4. Because we conclude that it does not, we then address the University's claim that article X, section 4 of the Utah Constitution grants it institutional autonomy, thereby allowing it to promulgate its firearms policy despite contrary Utah law. We also briefly address any role that policy concerns may play in this discussion.

## I. THE APPLICABILITY OF ARTICLE I, SECTION 6 OF THE UTAH CONSTITUTION

 ¶ 17 After oral argument, we asked the parties to supplement their briefing to address whether article I, section 6 of the Utah Constitution bears on this case. Although article I, section 6 is the provision of the Utah Constitution that explicitly governs firearms regulation, the parties did not address it in their initial briefs. When interpreting the constitution, we strive to harmonize constitutional provisions with one another and with the meaning and function of the constitution as a whole. *See Skeen v. Craig*, 31 Utah 20, 86 P. 487, 488 (1906). We therefore considered it prudent to have the parties address the applicability of article I, section 6.

 ¶ 18 At the time of statehood, the State of Utah "committed its whole lawmaking power to the legislature, excepting such as is expressly or impliedly withheld by the state or federal constitution." *Utah Sch. Bds. Ass'n v. Utah State Bd. of Educ.*, 2001 UT 2, ¶ 11, 17 P.3d 1125 (internal quotation marks omitted); *see also* Utah Const. art. VI, § 1 (vesting the state's legislative power in the legislature and "[i]n the people of the State of Utah"). Indeed, "[t]he Utah Constitution is not one of grant, but one of limitation." *Utah Sch. Bds. Ass'n*, 2001 UT 2, ¶ 11, 17 P.3d 1125. Article I, section 6 of the Utah Constitution is such a limitation inasmuch as it limits the legislature's authority to infringe the "individual right of the people to keep and bear arms." [2]

 ¶ 19 When we interpret constitutional provisions, "our starting point ... is

---

2. Although the Utah legislature possesses plenary lawmaking authority except as limited by the state and federal constitutions, numerous cases have referred to the legislature's "article I, section 6 power" to regulate firearms. *See, e.g., State v. Willis*, 2004 UT 93, ¶ 16, 100 P.3d 1218 ("[W]e interpret *the grant of authority to the legislature to regulate the lawful 'use' of arms in article I, section 6 of the Utah Constitution* to include the ability to restrict convicted felons from possessing firearms." (emphasis added)); *Hansen v. Am. Online, Inc.*, 2004 UT 62, ¶ 14, 96 P.3d 950 ("The legislature has exercised *its article I, section 6 power* to enact numerous statutes defining the scope of the lawful use and possession of firearms." (emphasis added)); *State v. Vlacil*, 645 P.2d 677, 683 (Utah 1982) (Stewart, J., concurring) ("It is conceded by all that *the State has the power under Article I, § 6 of the*

Utah Constitution to enact reasonable regulations for the control of firearms." (emphasis added)); *State v. Beorchia*, 530 P.2d 813, 814 (Utah 1974) (noting that, under the pre–1984 version of article I, section 6, it was "quite evident ... that *the Legislature had sufficient power* to enact the statute in question" (emphasis added)). In fact, the legislative power to regulate firearms arises from article VI, section 1 of the Utah Constitution, which vests in the legislature the "Legislative power of the State." *See Utah Sch. Bds. Ass'n*, 2001 UT 2, ¶ 11, 17 P.3d 1125; Utah Const. art. VI, § 1. The second sentence of article I, section 6, which states that "nothing herein shall prevent the legislature from defining the lawful use of arms," is therefore more accurately viewed as a limitation on the people's right to "keep and bear arms."

the textual language itself." *Grand County v. Emery County*, 2002 UT 57, ¶ 29, 52 P.3d 1148. The first clause of article I, section 6 reads: "The individual right of the people to keep and bear arms for security and defense of self, family, others, property, or the state, as well as for other lawful purposes shall not be infringed...." Utah Const. art. I, § 6. This clause clearly recognizes "[t]he individual right of the people to keep and bear arms" and explicitly forecloses the state's ability to "infringe" on that right. *Id.* Put differently, even though the legislature possesses the state's "whole lawmaking power," *Utah Sch. Bds. Ass'n*, 2001 UT 2, ¶ 11, 17 P.3d 1125 (internal quotation marks omitted), it cannot use that power to infringe on the individual right to "keep and bear arms." Utah Const. art. I, § 6.

¶ 20 The second clause of article I, section 6, however, places a limit on that restriction. It provides that "nothing herein shall prevent the legislature from defining the lawful use of arms." Utah Const. art. I, § 6. In other words, while the legislature cannot "infringe" on the individual right to "keep and bear arms," it may "defin[e] the lawful use of arms." *Id.* By definition, then, a legislative act defining the lawful use of arms does not "infringe" upon the individual right to bear arms. The distinction between defining and infringing is borne out in numerous cases upholding legislative acts that ostensibly burden the right to bear arms. *See, e.g., State v. Willis*, 2004 UT 93, ¶ 16, 100 P.3d 1218 (interpreting article I, section 6 to permit "restrict[ing] convicted felons from possessing firearms"); *State v. Wacek*, 703 P.2d 296, 298 (Utah 1985) (noting that a similarly structured, earlier version of article I, section 6 did not mandate reversal of a defendant's conviction for a firearms offense); *State v. Beorchia*, 530 P.2d 813, 814 (Utah 1974) (same).

¶ 21 Because the state's "whole lawmaking power" is vested in the legislature, *Utah Sch. Bds. Ass'n*, 2001 UT 2, ¶ 11, 17 P.3d 1125, only the legislature may "defin[e]

the lawful use of arms" unless it delegates that power to another governmental entity. The enactment of section 63–98–102 renders it absolutely clear that the legislature has chosen not to delegate any of its lawmaking power in regard to firearms. Therefore, to the extent that the University's firearms policy constitutes an attempt to "defin[e] the lawful use of arms," the policy would contravene article I, section 6 of the Utah Constitution, which reserves that authority exclusively to the legislature. We conclude, however, that the University's firearms policy does not constitute such an attempt because it is not legislative in nature.

¶ 22 The legislature's power to "defin[e] the lawful use of arms" must necessarily be exercised through its lawmaking power because the legislature has no other constitutional authority to define suggested firearm use. Indeed, its only mechanism for "defining the lawful use of arms" is through legislative enactment.

¶ 23 While this principle may seem almost tautological, it has great importance here because it establishes the legislature as the only entity with authority to enact legislation defining the "lawful use of arms." We must therefore determine whether the University's adoption of its firearms policy is legislative in nature. We conclude that it is not.

¶ 24 To determine whether an internal policy rises to the level of legislation, we must take into account the nature of the institution establishing the policy and its relationship to the class of persons affected by it, as well as the legal effect of the policy's violation. Because the precise distinction between a legislative act and a mere policy is a matter of first impression in this court,[3] we begin by examining the characteristics of those actions that are indisputably legislative in nature.

¶ 25 When a legislative body, whether of the state or of a local government, enacts a statute or an ordinance, that law applies to everyone within the geographical area over which that body has jurisdic-

---

**3.** The authorities that seek to define a legislative act have tended to do so in order to distinguish such an act from an adjudicative act, *see, e.g., V-1 Oil Co. v. Dep't of Envtl. Quality*, 939 P.2d 1192, 1196 (Utah 1997), or an administrative act, *see, e.g., Citizens' Awareness Now v. Marakis*, 873 P.2d 1117, 1125 (Utah 1994). Such distinctions are of limited use here.

tion. When an administrative agency promulgates a regulation in accord with the legislative power delegated to it by the state legislature, the regulation applies to everyone over whom the agency has jurisdiction by virtue of their involvement in a particular endeavor that the state has authority to regulate. These actions may be deemed legislative because they rely on the lawmaking body's jurisdictional authority over a geographical area or a category of persons engaged in a particular activity. The legal effect of violating such a legislative act may range from the imposition of criminal penalties to the withholding of government rights or benefits to which persons would otherwise be entitled.

¶ 26 As a corporate entity engaged in the enterprise of higher education, the University is distinct from an administrative agency that may exert authority over an entire industry or occupation. Indeed, the University's firearms policy appears in the University's personnel policies and in its code of student conduct.[4] The policy does not purport to apply to the population at large or even to the entire category of higher education students or staff, but only to those students enrolled at and those faculty and staff employed by the University itself. And the policy applies only to these individuals because of their contractual or quasi-contractual relationships with the University, not because the University has jurisdiction over a particular geographic area or a particular field of endeavor.[5] *See Piacitelli v. S. Utah State Coll.*, 636 P.2d 1063, 1066 (Utah 1982) (holding that the school's policy manual created only a "contractual obligation" and did not create "statutory or constitutional rights"); *Logan City Sch. Dist. v. Kowallis*, 94 Utah 342, 77 P.2d 348, 354 (1938) (indicating that children are admitted to public schools outside of their home districts under a contractual right).

¶ 27 With regard to its legal effect, the policy indicates that the University may undertake "disciplinary action" against a student or an employee who violates it. This may result in a student's "written reprimand, the imposition of a fine or payment of restitution, community service, probation, suspension, or dismissal from the University" or an employee's "written reprimand, written warning, disciplinary suspension without pay, demotion, dismissal for cause, or other action deemed appropriate by the supervisor." Most of these actions involve placing a burden on the violating party's relationship with the University, and the harshest of them involve severing that relationship. Although a fine may be imposed on students, the policy does not indicate any mechanism for enforcing such a fine other than the threat of withholding student records or other such disciplinary action. A private institution would be equally able to impose these types of penalties because the power to impose them derives from the contractual or quasi-contractual relationship between the institution and the violating party, not from the institution's governmental status. *See Jones v. Vassar Coll.*, 59 Misc.2d 296, 299 N.Y.S.2d 283, 286 (1969) (recognizing the "contractual relationship between the student and the college which is subject to the rules and regulations of the college"). In other words, it is only because there exists such a relationship that the institution has the ability to punish the violation of its policy.

4. For purposes of this case, the letter by University Interim President McIntyre "extending the prohibition on the possession or use on campus of any firearm ... to all University employees, including faculty," is the equivalent of a personnel policy.

5. When the basis of a public institution's authority over others is its property ownership, rather than a contractual or quasi-contractual relationship, the question of whether a policy is legislative becomes more difficult. For example, in contrast to the University's employment policy and student code, the University's parking and traffic rules do apply to everyone who enters University premises in a vehicle. *See* University Policy 2–28(III)(C) (indicating that "[c]ampus parking regulations shall be set forth in a pamphlet, available at the Office of Parking Service" and "shall apply to all campus lands except those leased to nonuniversity entities"); *see also* Utah Code Ann. § 53B–3–103(2)(a)(i) (authorizing the board of regents to authorize the University to "enact traffic, parking, and related regulations governing all individuals on campuses and other facilities owned or controlled by the [University]"). We express no opinion on whether such rules might be deemed legislative in nature.

¶ 28 We conclude that the University's firearms policy is most appropriately viewed as a contract with its students and employees. It is therefore not legislative in nature. Because the policy is not legislative in nature, its adoption by the University did not violate the constitutional directive that only the legislature shall "defin[e] the lawful use of arms." Utah Const. art. I, § 6. We therefore conclude that article I, section 6 does not bear on the validity of the University's firearms policy.

## II. THE UNIVERSITY'S CLAIM TO INSTITUTIONAL AUTONOMY UNDER ARTICLE X, SECTION 4 OF THE UTAH CONSTITUTION

¶ 29 Having concluded that article I, section 6 of the Utah Constitution does not bear on the validity of the University's firearms policy, we turn to the University's claim that Utah Code section 63–98–102 is an unconstitutional infringement of its right to institutional autonomy guaranteed by article X, section 4 of the Utah Constitution. For the reasons discussed below, we reject the University's claim.

¶ 30 The cardinal rule of constitutional interpretation is to begin with the plain language of the provision in question. *Grand County v. Emery County*, 2002 UT 57, ¶ 29, 52 P.3d 1148; *Utah Sch. Bds. Ass'n v. Utah State Bd. of Educ.*, 2001 UT 2, ¶ 13, 17 P.3d 1125. In this regard, we attempt to employ an "objective" analysis, *State v. Smith*, 2005 UT 57, ¶ 11, 122 P.3d 615, and avoid examining the language in "isolation." *Estate of Berkemeir v. Hartford Ins. Co.*, 2004 UT 104, ¶ 13, 106 P.3d 700. When confronted with potential conflicts between constitutional provisions, we construe them in a manner to harmonize them with one another. *Skeen v. Craig*, 31 Utah 20, 86 P. 487, 488 (1906). And when confronted with a constitutional challenge to a statute, we presume the statute to be constitutional, resolving any reasonable doubts in favor of constitutionality. *Utah Sch. Bds. Ass'n*, 2001 UT 2, ¶ 9, 17 P.3d 1125. To determine the scope of the University's right to institutional autonomy under article X, section 4, we therefore begin with its plain language, keeping in mind the general constitutional structure in which it appears.

¶ 31 As previously discussed, the Utah Constitution "committed [the state's] whole law-making power to the Legislature," and the legislature's "authority is absolute and unlimited, except by the express restrictions of the fundamental law." *Kimball v. Grantsville City*, 19 Utah 368, 57 P. 1, 4–5 (1899). We accordingly presume that the legislature possesses plenary authority to regulate the University unless a constitutional provision provides to the contrary. *Univ. of Utah v. Bd. of Exam'rs*, 4 Utah 2d 408, 295 P.2d 348, 360 (1956) (indicating that "in order that the legislative body be restricted in educational as well as all other matters, it is imperative that the Legislature be restricted expressly or by necessary implication by the Constitution itself").

¶ 32 With these general principles in mind, we turn to the text of article X, section 4, the constitutional provision governing higher education, to determine whether it limits the legislature's power over the University. It provides:

> The general control and supervision of the higher education system shall be provided for by statute. All rights, immunities, franchises, and endowments originally established or recognized by the constitution for any public university or college are confirmed.

Utah Const. art. X, § 4.

¶ 33 Nothing in the first sentence of this section could be read to limit the legislature's right of control over the University. To the contrary, the phrase explicitly confirms the legislature's right to "general control and supervision of the higher education system" through its lawmaking power. Absent any restrictive language, the legislature may supervise and generally control all University functions.

¶ 34 The basis for the University's claimed right of institutional autonomy is the second sentence of article X, section 4, which confirms "[a]ll rights, immunities, franchises, and endowments originally established or recognized by the constitution for any public university or college." The University con-

tends that these rights include the institutional autonomy to disregard legislative enactments that interfere with its academic mission. Because this sentence reserves to the University only those rights "originally established" by the constitution, we must examine the scope of those original rights.

¶ 35 The original constitutional provision governing higher education, article X, section 4, remained unchanged from the time of statehood until the adoption of the current provision. The original version provided:

> The location and establishment by existing laws of the University of Utah, and the Agricultural College [Utah State University] are hereby confirmed, and all the rights, immunities, franchises and endowments heretofore granted or conferred, are hereby perpetuated unto said University and Agricultural College respectively.

Utah Const. art. X, § 4 (1896).

¶ 36 By its plain language, this original constitutional provision *did not create or confer* any new powers or authority on the University. Rather, it simply "perpetuated" the rights enjoyed by the University at the time of statehood. We therefore must examine the scope of the rights enjoyed by the University at the time our constitution was adopted.

¶ 37 This court exhaustively examined the historical record and outlined the scope of the University's rights at the time of statehood in the case of *University of Utah v. Board of Examiners*, 4 Utah 2d 408, 295 P.2d 348 (1956). As explained in that opinion, the University was "instituted and incorporated [in 1850] by an ordinance of the State of Deseret." *Id.* at 350. In 1892, just four years prior to statehood, the territorial legislature enacted a new comprehensive statute governing the University and repealed all other laws in conflict with its provisions (the "1892 Act"). The 1892 Act described the University as "a body corporate with perpetual succession" with "all the property, cred-

its, effects and franchises of the existing corporation, subject to all [its] contracts, obligations and liabilities." Utah Rev. Stat. § 2295 (1898). It vested management of the University in a board of regents. *Id.* Finally, it provided that the University "shall be deemed a public corporation and be subject to the laws of Utah, from time to time enacted, relating to its purposes and government." *Id.*

¶ 38 The University reasons that because the 1892 Act vested management of the University in a board of regents and gave it power to employ instructors and employees, the University has authority to supervise and control University activities and is protected "from legislative interference of the University's autonomy in relation to academic matters." We disagree.

¶ 39 The territorial legislature gave the University broad authority to regulate its day-to-day affairs, and it retained the powers typically bestowed on corporations, such as the authority to make contracts, purchase property, and use the proceeds of such property. *See* 18 Am.Jur.2d *Corporations* § 1 (2006) (generally listing the attributes of a corporation). But the University was never given the power to act in contravention of legislative enactments. Rather, the authority conferred on the University by the 1892 Act, which was later incorporated into the Utah Constitution, was limited by the language rendering the University "subject to the laws of Utah." 1892 Laws of Utah, ch. IX, § 1. As we concluded in *Board of Examiners*, although the University retained certain rights, privileges, immunities, and franchises associated with public corporations, it was never exempt from the obligation of all Utah citizens and entities to follow Utah law. Its authority was subject to general legislative oversight, even to legislative enactments relating to its core academic functions.[6]

¶ 40 Our conclusion in this regard is not only supported by the language of the 1892

---

**6.** The fact that the 1892 Act gave the board of regents of the University the power to "adopt bylaws" and to "employ or provide for the employment of all instructors and employees, 1892 Laws of Utah ch. IX, § 11, indicates only that the University was given some authority to control its internal affairs. Nothing in the 1892 Act suggests that the legislature intended to give up ultimate governing authority over the University simply because it conferred on the University certain powers of internal governance.

Act, but it is also supported by legislative enactments following statehood. Shortly after statehood, the state legislature enacted a statute prohibiting the University's bylaws and regulations from being "inconsistent with the laws of the state." Utah Rev. Stat. § 2295 (1898). And the University was subject to a number of laws that governed everything from the composition of its governing body to the content of its academic offerings. Our opinion in *Board of Examiners*, 295 P.2d 348, summarizes the many early legislative enactments directed at the University. For example, a 1905 statute prohibited the University from including "in its courses agriculture, horticulture, animal industry, veterinary science, domestic science and art." Compiled Laws of Utah tit. 74, ch. 11, § 2292 (1907). A 1921 statute prohibited the University from awarding degrees in domestic science or art, Utah Rev. Stat. § 75–4–5 (1933), and a 1923 statute required the University to give instruction on the Constitution of the United States. Utah Rev. Stat. § 75–1–2 (1933). In short, neither the constitutional text nor the historical record supports the University's view that it possesses constitutional autonomy to disregard legislative enactments.

¶ 41 The University acknowledges that it is "subject to legislative control regarding its budget and finances," but maintains that this court has never held that the legislature may control the University's central academic purpose. While the University is correct that our prior cases did not involve legislative action directed at the University's academic mission, the fact remains that the reasoning of those cases is incompatible with the University's position. Our prior case law construing article X, section 4 has consistently upheld the power of the legislature to exercise "general control and supervision" over higher education, including the University.

¶ 42 In *Spence v. Utah State Agricultural College*, 119 Utah 104, 225 P.2d 18 (1950), this court upheld the ongoing authority of the legislature to alter the controlling board of what is now Utah State University. In describing the purpose and effect of article X, section 4, the opinion used the following language:

> [W]hile the article does make mention of perpetuating the rights, franchises, immunities and endowments previously granted, its wording does not, even by implication, suggest an intent to oust the legislature from ever dealing with any affairs of the college, be the dealing favorable or prejudicial to its welfare.

*Spence*, 225 P.2d at 22.

¶ 43 In *Board of Examiners*, this court examined the question of whether "Article X, Section 4 of the Utah Constitution establishe[d] the University as a constitutional corporation free from the control of the Legislature, administrative bodies, commissions and agencies and officers of the State." 295 P.2d at 349. After an extensive analysis of the constitutional language and historical context of article X, section 4, this court answered the question in the negative. *Id.* at 371.

¶ 44 The *Board of Examiners* opinion distinguished Utah's constitutional language from that of other states whose constitutions vest their institutions of higher learning with the institutional autonomy the University seeks. *Id.* at 355–60. After discussing the differences between those constitutions and Utah's constitution, it reasoned:

> If the framers of the Utah Constitution had intended to create the University of Utah a constitutional corporation, completely autonomous and free from legislative control, it is difficult to understand why language such as was used in the constitutions of Michigan, Minnesota and the other constitutions referred to was not used.
>
> . . . .
>
> That the framers of the Utah Constitution did not adopt language similar to the constitutions of Minnesota and Idaho, even though the convention had before it the constitutions of those states is evidence that a different result was intended.

*Id.* at 360. It concluded:

> There is not in Article X, Section 4, or elsewhere in the Constitution of Utah any express prohibition against action by the legislature respecting the University. Nor do we believe that the Constitution con-

tains any implied restraint against such action.

. . . .

Nothing in the arguments and debates in the Constitutional Convention on the education article, (X) and more particularly, on Section 4, tends to suggest that it was considered by the delegates that the Legislature by said article would be prohibited from acting in respect to the University, except in matters of location and establishment.

*Id.* at 361, 368.

¶ 45 In *State Board of Education v. State Board of Higher Education*, 29 Utah 2d 110, 505 P.2d 1193, 1195–96 (1973), this court described its prior decisions interpreting article X, section 4 as establishing that the article "confirmed the location and establishment of [the University and Utah State University] but that they remained subject to the control of the legislature." Indeed, our precedent has been so clear on this issue that the Tenth Circuit has recognized that "the University is not autonomous but rather is a state-controlled entity." *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 575 (10th Cir. 1996).

¶ 46 Our interpretation of the language in article X, section 4 confirming the legislature's right of "general control and supervision" over the University is also consistent with our interpretation of similar language found elsewhere in our constitution. In *Utah School Boards Ass'n v. Utah State Board of Education*, 2001 UT 2, ¶ 14, 17 P.3d 1125, we examined language from article X, section 3,[7] which governs Utah's public education system. While section 4 vests "general control and supervision" of the higher education system in the legislature, section 3 vests "general control and supervision" of the public education system in the State Board of Education. We construed this language in the context of the Utah School Boards Association's challenge to a statute that vested the state school board with au-

thority to make decisions regarding individual schools. The Association argued that the phrase "general control and supervision" actually restricted the authority of the state school board, preventing it from exercising "specific or local supervision and control." *Id.* ¶ 7.

¶ 47 We rejected the association's premise that the phrase "general control and supervision" limited the Board's authority. Instead, we concluded that the "common and ordinary understanding" of the phrase encompassed "the authority to direct and manage all aspects of the public education system in accordance with the laws made by the legislature." *Id.* ¶ 22.

¶ 48 Applying this plain language interpretation to article X, section 4, we conclude that because it reserves to the legislature the power of "general control and supervision" over the higher education system, the legislature has the ability to generally manage all aspects of the University. No other constitutional language restricts the legislature from exercising this power, and the legislature has not passed any statutes ceding its authority. Thus, the University cannot possess autonomous powers that would allow it to act in contravention of legislative enactments.

¶ 49 Our holding in this regard is also consistent with the language of Utah's Enabling Act. Section 11 of that Act indicates that the University "shall forever remain under the exclusive control of [the] State." Act of July 16, 1894, ch. 138, 28 Stat. 107, 110. "Exclusive" suggests that other entities may not exercise that control. *See Webster's II: New Riverside University Dictionary* 450 (1988 ed.). The Enabling Act therefore supports our conclusion that the legislature's role in relation to the University goes beyond merely financing its operations.

¶ 50 As support for its view that the framers intended the University to be free from legislative control, the dissent relies on the fact that the framers did not preserve the legislature's powers to amend the Universi-

7. Article X, section 3 provides:
 The general control and supervision of the public education system shall be vested in the State Board of Education. The membership of the board shall be established and elected as

provided by statute. The State Board of Education shall appoint a State Superintendent of Public Instruction who shall be the executive officer of the board.
Utah Const. art. X, § 3.

ty's corporate charter, even though it preserved this right for other corporations. *Infra* ¶ 65. We find such an argument to be untenable. The fact that the University's *corporate status* is beyond legislative control does not mean that the framers intended to cede the legislature's power to control other aspects of the University. 1892 Laws of Utah ch. IX, § 1. The concurrence in *Board of Examiners*, 295 P.2d at 371, specifically recognized that whether or not the University is regarded as a constitutional corporation, it is not "completely free." Rather, "[i]ts powers are still to be found in, and circumscribed by, the language by which it is created ... which seems to indicate clearly that it was subject to control by the territorial legislature, and consequently by the state legislature." *Id.*

¶ 51 In summary, we simply cannot agree with the proposition that the Utah Constitution restricts the legislature's ability to enact firearms laws pertaining to the University. The plain language of article X, section 4 and this court's prior pronouncements on the issue of university governance compel the conclusion that the University is subject to legislative control, and therefore cannot enforce its firearms policy in contravention of state law.

## III. POLICY CONCERNS AND THE UNIVERSITY'S CLAIM TO ACADEMIC FREEDOM

¶ 52 The University devotes much of its briefing to the policy reasons supporting its claim to institutional autonomy, arguing that its firearms policy is a necessary component of an environment necessary to fulfill its educational mission. Specifically, the University asserts that failure to recognize a right of institutional autonomy will lead to undesirable results, including safety concerns, a hampering of the free exchange of ideas, and potential disruption of "the work and discipline of the school."

¶ 53 No matter how persuasive we may find such arguments, we are constrained by our judicial role. Our role is one of interpreting, not drafting. "This court is not called on to decide which is better, an autonomous University or a legislatively con-

trolled University. Rather, it is our duty to give proper effect to the language of the Constitution and the territorial statute bearing on the question." *Univ. of Utah v. Bd. of Exam'rs*, 4 Utah 2d 408, 295 P.2d 348, 354 (1956). We are not free to disregard constitutional and statutory language on the basis of policy considerations. "[U]nless it appears so clearly ... beyond a reasonable doubt that there is some violation of a constitutional provision, or irreconcilable conflict therewith, the courts should leave that responsibility where the constitution expressly placed it: with the legislature." *Jenkins v. Bishop*, 589 P.2d 770, 771 (Utah 1978) (Crockett, J., concurring).

¶ 54 In this case, we conclude that the legislature has not overstepped its constitutional bounds. The plain meaning of article X, section 4 of the Utah Constitution, supported by history, context, and our prior decisions, is that although the University has broad powers, it is not completely autonomous, and it is ultimately subject to legislative oversight. Policy considerations, no matter how persuasive, cannot dictate a contrary interpretation. The Utah Constitution does not grant the University authority to promulgate firearms policies in contravention of legislative enactments, and it is not our place to do so. To the extent their constituents disagree with the legislature's choice, their remedy is to express their dissatisfaction at the ballot box.

¶ 55 Finally, we reiterate that the University's claims based on the right to academic freedom under the First and Fourteenth Amendments of the United States Constitution are not before us. The federal district court has retained jurisdiction over these claims. With the University's state law claims resolved, the parties are free to return to federal court for resolution of the University's federal law claims.

## CONCLUSION

¶ 56 We hold that the University lacks the authority to enact firearms policies in contravention of Utah statutory law. Having determined that article I, section 6 of the Utah Constitution is not relevant to our analysis,

we conclude that the plain language of article X, section 4 is inconsistent with the University's claim that it possesses the institutional autonomy to promulgate a firearms policy in contravention of Utah Code section 63–98–102(5).

¶ 57 Article X, section 4 did not create any new rights in the University. Rather, it perpetuated only those rights enjoyed by the University at the time of statehood. The 1892 Act establishing the University as a public corporation provided that the University was subject "to the laws of Utah, from time to time enacted, related to its purposes and government." 1892 Laws of Utah ch. IX, § 1. We accordingly conclude that the University is subject to Utah law prohibiting it from enacting or enforcing any policy restricting the possession or use of firearms.

¶ 58 Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.

DURHAM, Chief Justice, dissenting:

¶ 59 I concur with the majority's analysis in Part I but respectfully dissent from the conclusions reached in Part II.

¶ 60 The dispositive question before the court is whether Utah Code section 63–98–102 is unconstitutional insofar as it purports to prohibit the University, absent "specific[ ] authoriz[ation]" from the legislature, from "establish[ing] or enforc[ing] any . . . policy pertaining to firearms that in any way inhibits or restricts the possession or use of firearms on either public or private property." Utah Code Ann. § 63–98–102(5) (2004). The answer to this question rests on whether article X, section 4 of the Utah Constitution vests the University with the autonomous power to restrict firearm possession among its students and employees. If article X, section 4 grants such authority to the University, then the legislature is foreclosed from infringing upon this authority by a statutory enactment such as section 63–98–102.

¶ 61 Article X, section 4 states:

The general control and supervision of the higher education system shall be provided for by statute. All rights, immunities, franchises, and endowments originally es-

tablished or recognized by the constitution for any public university or college are confirmed.

The University rests its claim of autonomy on the second sentence of this section. Essentially, it argues that the constitutional language perpetuating "[a]ll rights, immunities, franchises and endowments originally established or recognized" reserves to the University the power to take whatever action it deems necessary to carry out its mission of providing higher education to the people of the state. I therefore examine the meaning of this second sentence more closely.

¶ 62 The use of the phrase "originally established or recognized by the constitution" in the second sentence of article X, section 4 requires an examination of the original version of this constitutional provision as it existed prior to its 1987 amendment. The original provision confirmed "[t]he location and establishment by existing laws of the University of Utah" and, in turn, "perpetuated unto said University" "all the rights, immunities, franchises and endowments heretofore granted or conferred." Utah Const. art. X, § 4 (amended 1987). As the Attorney General and the legislature argue, the terms "rights, immunities, franchises, and endowments" are terms commonly used to refer to the powers of corporate entities. It seems clear that they so refer here since, as mentioned, the University is a corporate entity. The question is, therefore, what rights, immunities, franchises, and endowments were granted to the University as a corporate entity prior to the Utah Constitution's ratification in 1896?

¶ 63 This court faced the same question previously when the University sought a declaration that it was not subject to state legislative enactments "requiring preaudit of bills, submission of work programs and deposit of funds into the State Treasury." *Univ. of Utah v. Bd. of Exam'rs*, 4 Utah 2d 408, 295 P.2d 348, 350 (1956). The court denied the University's claim, relying primarily on an 1892 territorial enactment that declared the University " 'a public corporation [that shall] be subject to the laws of Utah, from time to time enacted, relating to its purposes and government.' " *Id.* at 352 (quoting 1892 Laws of Utah ch. IX, § 8). The Attorney General

argues that *Board of Examiners* decided the issue now before us because it affirmed the continuing applicability of this provision in the 1892 act.

¶ 64 Although I agree that *Board of Examiners* rejected the University's claim of absolute autonomy, I disagree that the court in that decision conclusively subjected the University to legislative control on all matters. As quoted above, the 1892 Act designated the University a "public corporation." One treatise has explained:

> A public corporation that is not municipal is one created by the state solely as its own device and agency.... A state university ... constitute[s], if incorporated, [an] illustration[ ] of this class. Because the independent powers of such corporations are frequently nominal, or small ... these organizations are sometimes described ... as public quasi corporations.

1 Eugene McQuillin, *The Law of Municipal Corporations* § 2.03.20 (3d ed. rev.1999). It does not necessarily follow, however, that all incorporated state universities have only nominal independent power, particularly where the university in question is provided for in the state constitution. *See, e.g., State ex rel. Black v. State Bd. of Educ.*, 33 Idaho 415, 196 P. 201, 205 (1921) (recognizing the University of Idaho as "a constitutional corporation with granted powers"); *Sterling v. Regents of Univ. of Mich.*, 110 Mich. 369, 68 N.W. 253, 257 (1896) (interpreting the extensive powers granted to the University of Michigan by Michigan's constitution); *State ex rel. Univ. of Minn. v. Chase*, 175 Minn. 259, 220 N.W. 951, 952–54 (1928) (discussing the constitutional corporate status of the University of Minnesota). Although the language in our state's constitution varies from the language in the constitutions of Idaho, Minnesota, and Michigan,[1] our constitution nevertheless recognizes the University's corporate powers. Article X, section 4 explicitly perpetuated these corporate powers in 1896 and thereafter confirmed them in 1987.[2] In my view, this constitutional recognition of corporate powers raises the status of the University above that of most public corporations.

¶ 65 Significantly, the University was the only corporate entity, public or private, whose corporate powers the framers of the original 1896 constitution sought to insulate from subsequent legislative control. Elsewhere, the constitution specifically states that "[n]o law shall be passed granting irrevocably any franchise, privilege or immunity." Utah Const. art. I, § 23. This provi-

---

**1.** Like the majority and the *Board of Examiners* court, we recognize the Idaho and Michigan constitutions contain language that is somewhat different from the language used in our constitution. For example, article IX, section 10 of the Idaho Constitution provides, in part:

> All the rights, immunities, franchises, and endowments, heretofore granted thereto by the territory of Idaho are hereby perpetuated unto the [University of Idaho]. The regents shall have the general supervision of the university, and the control and direction of all the funds of, and appropriations to, the university, under such regulations as may be prescribed by law.

Likewise, article VIII, section 5 of the Michigan constitution designates each board of regents of the University of Michigan, Michigan State University, and Wayne State University as a separate "body corporate" and provides that "[e]ach board shall have general supervision of its institution and the control and direction of all expenditures from the institution's funds."

The current provision in Minnesota's constitution is more closely aligned to article X, section 4 of the Utah Constitution, providing only that "[a]ll the rights, immunities, franchises and endowments heretofore granted or conferred upon the University of Minnesota are perpetuated unto the university." However, the constitutional provision in existence at the time of *State ex rel. University of Minnesota v. Chase*, 175 Minn. 259, 220 N.W. 951, 952–54 (1928), also provided that "all lands which may be granted hereafter by Congress, or other donations for said university purposes, shall vest in the institution referred to in this section." *Id.* at 953–54 (citing Minn. Const. art. 8, § 4 (1858)). In *University of Utah v. Board of Examiners*, 4 Utah 2d 408, 295 P.2d 348, 356 (1956), this court relied heavily on the latter clause in distinguishing the language of the Minnesota constitution from the language in our constitution.

**2.** The 1896 constitution's perpetuation of the University's rights in specific corporate language distinguishes it from at least one earlier draft of the constitution that never went into effect. The 1882 draft stated that "[t]he University of [Utah] shall be the University of this State, and be under the control of the legislature, and constitute a public trust." Constitution of the State of Utah, art. XI, § 4 (1882). The fact that the framers of the 1896 constitution removed this language and instead explicitly perpetuated the University's corporate powers lends further support to my interpretation.

sion made clear that all corporate charters granted after the constitution's adoption would be subject to legislative amendment. The 1896 article governing corporations directed that "[c]orporations ... shall not be created by special acts" and that "[a]ll laws relating to corporations may be altered, amended or repealed by the Legislature." Utah Const. art. XII, § 1 (amended 1993). Again, this provision allowed the legislature to amend the general laws under which private corporations would be chartered. In regard to municipal corporations, the 1896 constitution similarly provided that "[t]he Legislature, by general laws, shall provide for the incorporation ... of cities and towns ...; which laws may be altered, amended or repealed." Utah Const. art. XI, § 5 (amended 1933 & 2001). The proceedings of the constitutional convention indicate that the framers of the 1896 constitution were concerned with the United States Supreme Court case of *Trustees of Dartmouth College v. Woodward,* 17 U.S.(4 Wheat) 518, 4 L.Ed. 629 (1819), which had held that a legislature may not amend a corporate charter, once granted, unless the legislature expressly retains the right to do so in the original grant. *See* 1 *Official Report of the Proceedings and Debates of the Constitutional Convention* 366 (1898) (statement of Mr. Evans) (citing *Dartmouth College* when urging passage of article I, section 23); *id.* at 1467 (statement of Mr. Hart) (citing *Dartmouth College* when urging passage of article XII, section 1, recognizing that, "when the legislature once granted a corporate privilege, under the decision of that case the state itself no longer had any power over the corporation"). The fact that the framers of the Utah Constitution were careful to preserve the legislature's power to amend the charters of all corporations, private or municipal, except for the University's strongly suggests an intent to preserve the University's corporate powers independent of legislative control and supports my plain language interpretation of article X, section 4. *See also State ex rel. Univ. of Minn.,* 220 N.W. at 954 (interpreting the Minnesota Constitution's perpetuation of "[a]ll the rights, immunities, franchises and endowments heretofore granted" to its state university as having "a definite legal import; the terms are those of confirmation in perpetuity of a prior grant of corporate rights").

¶ 66 Also in line with this interpretation, the two justices who concurred in the *Board of Examiners'* lead opinion qualified their concurrence by acknowledging that the University was a "constitutional corporation" in that "its corporate status and existence" were "beyond the power of legislative control." 295 P.2d at 371 (Crockett, J., concurring); *see also Hansen v. Utah State Retirement Bd.,* 652 P.2d 1332, 1340 (Utah 1982) (recognizing that "the University of Utah ... enjoys a degree of constitutionally rooted independence" distinct from "an executive department agency"). The concurrence thus recognized that "[i]t would undoubtedly require a change in the Constitution to abolish the University or to change substantially its nature or function" and noted that the case before it did not involve "any question of interference with the corporate existence or the operation of the institution in any manner that would substantially alter its function as a university." *Bd. of Exam'rs,* 295 P.2d at 371 (Crockett, J., concurring). Here, in contrast, according to the University, the question of its authority to prohibit students and employees from carrying firearms is directly tied to its ability to carry out its academic function.

¶ 67 Based on my examination of the early history of Utah's higher education system, as related in *Board of Examiners,* I agree with the concurrence in that case that "[t]he importance and desirability of a high degree of independence of [the University's] internal function, and of [its] academic freedom, was unquestionably recognized by the founders" of our constitution. *Id.* (Crockett, J., concurring). Significantly, the 1892 Act relied on in *Board of Examiners* clearly distinguishes between the state's general control over the University's purposes and government and the University's *internal regulation* of its academic affairs. In regard to the former, both the territorial legislature and the framers of our constitution were concerned with the relationship between the University and other institutions of public education. By retaining control over the University's purposes and government, the legislature intended to en-

sure the efficiency and effectiveness of the state's system of higher education as a whole. At the same time, the legislature defined the University's mission as the system's flagship academic institution. Both of these intentions are evidenced in the 1892 Act, which states:

> "The University shall be the highest branch of the public system of education in Utah, and, as far as practicable its courses and methods of instruction shall be arranged to supplement and continue the instruction in other branches of the public system, and with a view to afford and complete a thorough education to students of both sexes in arts[,] science and literature, and in such professional branches as may be included in its courses of instruction."

*Bd. of Exam'rs,* 295 P.2d at 352 (quoting 1892 Laws of Utah ch. IX, § 2). The 1892 act directed that the University include a department that would engage in "practice in teaching and instruction in pedagogy," 1892 Laws of Utah ch. IX, § 5, a "school for deaf mutes," 1892 Laws of Utah ch. IX, § 6, a "military department," at least until June 1894, 1892 Laws of Utah ch. IX, § 7, and a preparatory program, 1892 Laws of Utah ch. IX, § 8.

¶ 68 At the same time that the 1892 Act identified the University's role as the highest educational institution in the state and designated particular fields of instruction, the Act provided for the University's relative independence in regard to its internal academic affairs. The Act vested in the board of regents, the corporate officers of the Universi-

ty [3] (now the board of trustees), the authority to "adopt by-laws" governing its own organization and conduct and to "employ or provide for the employment of all instructors and employees." 1892 Laws of Utah ch. IX, § 11. The board was further authorized to

> provide for the organization of a faculty of the instructors of which the President shall be the chairman and executive officer, and . . . [to] commit to the faculty the general management and control of instruction, and the exercise of such powers regarding the examination, admission, classification and instruction of students as the regents may deem proper.

*Id.* This provision of the 1892 Act indicates that the University itself, as a corporate entity, was given control over internal academic matters regarding the hiring of faculty and the admission and instruction of students.

¶ 69 The framers of the 1896 Utah Constitution did nothing to controvert this authority. Rather, they were concerned with the distribution of educational purposes between the two institutions of higher education that then existed—the University and the Agricultural College (now Utah State University)—and with maintaining the unique function of each. While some delegates "supported consolidation [of the two institutions] on the ground of efficiency and economy," others "argued that agricultural subjects would be overshadowed by classical subjects if the schools were united." *Bd. of Exam'rs,* 295 P.2d at 368. By establishing the two institutions in their separate locations, the framers decided against consolidation. *Id.* In 1905, the legislature deter-

---

**3.** The original act establishing the University provided that the corporate powers of the University were vested in the board of regents and included the powers

> "to sue and be sued; to act as Trustees of the University, to transact, or cause to be transacted, all business needful to the prosperity of the University in advancing all useful and fine arts and sciences; to select and procure lands; erect and purchase buildings; solicit donations; send agents abroad; receive subscriptions; purchase books, maps, charts, and all apparatus necessary for the most liberal endowment of any library, and scientific institution; employ professors and teachers; make by-laws, establish branches of the University throughout the State; and do all other things

that fathers and guardians of the Institution ought to do."

*Bd. of Exam'rs,* 295 P.2d at 350 (quoting § 4, State of Deseret Ordinance of Feb. 28, 1850). This list includes many of the powers generally considered to inhere in a corporate entity simply by virtue of its corporate status. *See* 6 *Fletcher Cyclopedia Corporations* § 2485 (listing among a corporation's "inherent attributes" "the power of perpetual succession and duration, the power to sue and be sued in the corporate name, the power to purchase, hold, and transfer real and personal property, the power to have a corporate seal, the power to make and amend bylaws, the power to lend and invest money, the power to make contracts and guarantees" (footnotes omitted)).

mined that, in the absence of constitutional revision, it lacked the authority to reconsider this decision despite any duplication in the work in which the two institutions engaged. *Id.* at 369. It did, however, take other steps designed to limit duplication, "prohibit[ing] [the University] from including in its courses agriculture, horticulture, animal industry, veterinary science, domestic science and art." *Id.* at 364.

¶ 70 When presenting the 1896 constitution to the people for adoption, Utah's constitutional convention declared that "[t]he article on the proposed Educational System has absorbed the best thoughts and efforts of the Convention, and draws around the Public Schools such protection and defense as will secure for them, it is believed, the steady upward progress which is the enthusiastic desire of this people." 2 *Official Report of the Proceedings and Debates of the Constitutional Convention* 1847 (1898). I believe that the analysis above shows that the framers intended to secure the University's "protection and defense" by perpetuating its autonomous control over internal academic affairs, as originally granted in the 1892 Act. By retaining control over the University's purposes and the structure of its governing board, the 1892 territorial legislature ensured the government's ability to distribute various specialized educational endeavors among different public educational institutions and to regulate the entire higher education system with maximum efficiency. *E.g., State Bd. of Educ. v. State Bd. of Higher Educ.*, 29 Utah 2d 110, 505 P.2d 1193, 1196 (1973) (plurality opinion) (upholding the legislature's establishment of the Board of Higher Education, now the Board of Regents, to exercise general control, management, and supervision over the state's system of higher education); *Spence v. Utah State Agric. Coll.*, 119 Utah 104, 225 P.2d 18, 22 (1950) (holding the legislature could increase the number of trustees for the Agricultural College). Control over University budgetary matters, as recognized in *Board of Examiners*, similarly ensured that the state government would retain ultimate authority over the state's financial affairs. *See* 295 P.2d at 370 ("To hold that [the University] has free and uncontrolled ... use of its property and funds, while making the State guarantee said funds against loss or diversion is inconceivable."). At the same time, the University was granted autonomy over academic matters—matters which it was uniquely competent to control and which were intrinsic to its function as an institution of higher education. This type of internal autonomy is consistent with the powers that a private university would enjoy by virtue of its corporate status. *See* 6 *Fletcher Cyclopedia Corporations* § 2545 ("An educational institution ... may exercise those powers expressly conferred by law and its charter as well as those powers necessary to carry out its educational purposes. It generally has the power ... to charge reasonable fees to students; to grant degrees and issue diplomas; to provide specialized training and instruction for the trades and professions; and to regulate student conduct and activities." (footnotes omitted)).

¶ 71 I therefore conclude that, aside from the selection of general fields of study,[4] the power to control academic affairs on its campus is among those corporate rights and privileges perpetuated by the 1896 constitution and confirmed by its 1987 revision of article X, section 4. The majority disagrees, arguing that the University does not have academic autonomy. It bases its conclusion, in part, on the first clause in article X, section 4, which provides that "[t]he general control and supervision of the higher education system shall be provided for by statute." To determine the meaning of this phrase, the majority turns to the "general control and supervision" language contained in article X, section 3 of the Utah Constitution, as construed in *Utah School Boards Ass'n v. Utah State Board of Education*, 2001 UT 2, ¶ 14, 17 P.3d 1125. *Supra* ¶¶ 46–47. In *Utah School Boards Ass'n*, this court held that article X, section 3's clause vesting "[t]he general control and supervision" of the

---

4. In 1969, the legislature established a state agency, later named the Board of Regents, for the purpose of allocating educational functions among the various institutions in the state's system of higher education. Higher Education Act of 1969, ch. 138, § 4, 1969 Utah Laws 582, 583 (codified as amended at Utah Code Ann. § 53B–1–101 (2000)).

public education system in the State Board of Education meant the Board of Education had "the authority to direct and manage all aspects of the public education system in accordance with the laws made by the legislature." 2001 UT 2, ¶ 22, 17 P.3d 1125. According to the majority, the same construction applies to the "general control and supervision" language contained in article X, section 4, thus giving the legislature the same authority with respect to the University as the State Board of Education has with respect to the public schools. *Supra* ¶ 48. I disagree. The second sentence of article X, section 4, which confirms the University's original "rights, immunities, franchises, and endowments," acts as a limitation on the legislature's authority to provide for the "general control and supervision of the higher education system." Utah Const. art. X, § 4. No such limiting language exists in article X, section 3.[5] Thus, the two provisions cannot be said to have the same meaning, and the first clause of article X, section 4 does not grant the legislature "the authority to direct and manage all aspects" of the University's academic affairs. Based on this conclusion, I do not believe the legislature may enact a statute interfering with internal academic matters at the University. The remaining question, therefore, is whether, as the University argues, the provisions of the University's personnel and student conduct policies that prohibit employees and students from carrying firearms on campus fall within the scope of the University's academic autonomy.

¶ 72 As indicated above, the academic powers originally vested in the University relate to matters, such as faculty hiring and student instruction, that directly involve the unique institutional competence of a university. The Attorney General argues that the University's firearms policies are an attempt "to create policy contrary to legislative enactments." The Attorney General thus implies that the University's policies simply reflect a different view of the underlying social and political controversy over the potential benefits and harms involved in carrying firearms. I agree that the University has no particular expertise that would put it in a better position than the legislature to decide the state's policy in regard to these controversial issues, nor would I argue that the University has any authority to do so. That is a matter squarely within the legislature's authority to decide.[6] However, I do not regard the University's policies as reflecting a social or political judgment on whether, for example, more people carrying firearms generally leads to more or less crime. Applying, as they do, only to University employees and students, and only while these individuals are on the University campus, these policies merely reflect the University's judgment on an issue that is within the scope of its academic expertise—namely, the appropriate means by which to maintain an educational environment in its classrooms and on its campus.[7]

¶ 73 It is significant that, even outside the context of federal "academic freedom" analy-

5. The full text of article X, section 3 provides:

The general control and supervision of the public education system shall be vested in the State Board of Education. The membership of the board shall be established and elected as provided by statute. The State Board of Education shall appoint a State Superintendent of Public Instruction who shall be the executive officer of the board.

6. I therefore do not wish to imply that I believe the University to be immune from all state supervision, even in regard to its personnel policies. *Cf. Regents of the Univ. of Mich. v. Employment Relations Comm'n*, 389 Mich. 96, 204 N.W.2d 218, 223 (1973) (holding that "[p]roblems concerning the disputes between employees and public employers ... [are] a matter of public policy" and that the University of Michigan was therefore not exempt from the state public employees relations act).

7. The University points out that, in the past thirty-two years, only twenty crimes involving firearms have occurred on its campus, six of which were suicides and four of which involved armed robbery of credit unions. I recognize, of course, that those who wish to carry firearms for their personal protection are concerned with defending themselves not only against attackers who wield firearms but also against those who may otherwise be able to succeed in an assault without using a firearm. However, as there is no evidence in the record demonstrating that attacks by strangers (with or without firearms) against employees or students on campus are common, and as the University's policies do allow students and employees to receive authorization to carry a firearm on an individual basis, I remain unable to conclude that the policies implicate legislative concerns regarding the best way to prevent crime. Students and employees may well have their own concerns regarding the burden University policies place on their consti-

sis, a number of courts have explicitly recognized that a university's academic role extends beyond the classroom itself to the maintenance of an educational atmosphere on its campus. *See, e.g., Esteban v. Cent. Mo. State Coll.,* 415 F.2d 1077, 1088 (8th Cir.1969) (characterizing "college regulations relating to conduct" as "codes of general conduct which those qualified and experienced in the field have characterized ... as part of the educational process itself" and recognizing that "a school has inherent authority to maintain order and to discipline students"); *Moore v. Student Affairs Comm.,* 284 F.Supp. 725, 729 (M.D.Ala.1968) (recognizing Troy State University's "affirmative obligation to promulgate and to enforce reasonable regulations designed ... to promote an environment consistent with the educational process" (internal quotation marks omitted)); *Goldberg v. Regents of Univ. of Cal.,* 248 Cal.App.2d 867, 57 Cal. Rptr. 463, 472 (1967) (holding that a university's function of "impart[ing] learning and ... advanc[ing] the boundaries of knowledge ... carries with it the administrative responsibility to control and regulate that conduct and behavior of the students which tends to impede, obstruct or threaten the achievements of its educational goals"); *State v. Hunter,* 831 P.2d 1033, 1036 (Utah Ct.App. 1992) (holding that because "[s]tudents attending a university require and are entitled to an atmosphere that is conducive to educational pursuits," Utah State University had a "contractual *duty*" to maintain such an atmosphere in its student dormitories (emphasis added)); *Nzuve v. Castleton State Coll.,* 133 Vt. 225, 335 A.2d 321, 325 (1975) ("Educational institutions have both a need and a right to formulate their own standards [for academic discipline] and to enforce them."). This recognition reflects the fact that a university, by its nature, is more than the sum of its classes. Its educational endeavor extends to unorganized activities and discussion among its students and faculty in its offices, hallways, cafeterias, libraries, and open spaces on its campus. The maintenance of an appropriate atmosphere within which such activity may occur is directly related to a university's academic mission. Thus, if the University's policies are reasonably connected with its academic mission and the campus environment necessary to that mission, those policies are within its autonomous authority over academic affairs. The record in this case contains extensive evidence that practitioners and experts in higher education are convinced that a no weapons on campus policy is necessary to the educational enterprise; that evidence is uncontroverted. I therefore conclude that the University's policies governing students, faculty, and staff are within its authority to govern academic affairs.

¶ 74 My conclusion on this point says nothing about whether the policies at issue are reasonable exercises of the University's authority. As I perceive it, the issue before us today is which governmental entity—the University or the legislature—has the authority to make such policies, not whether the policies themselves are advisable or constitutionally sound. The University's academic interests must be weighed against individual constitutional rights where these rights are properly invoked. A policy that prohibited students and employees from openly brandishing firearms in classrooms would clearly be legitimate. Although I express no ultimate opinion on the matter, it is less immediately clear whether the current policies, which prohibit firearms that are hidden in a student's purse or an employee's desk, would survive an individual's constitutional challenge.

¶ 75 The majority fails to recognize the University's authority to establish any policy whatsoever relating to on-campus firearm possession by its students and employees. Under its analysis, the University may not subject a student to academic discipline for flashing his pistol to a professor in class. Because I believe the majority's conclusion is inconsistent with the authority that the state constitution grants the University as a corporate entity, I respectfully dissent.

tutional right to bear arms. Such concerns are properly raised by individual students and employees in a claim against the University under article I, section 6.